**CLERK OF CIVIL DISTRICT COURT**

**CIVIL DIVISON**
**421 Loyola Avenue, Room 402**
**New Orleans, Louisiana 70112**
**cdcclerk@orleanscdc.com**
**Telephone: (504) 407-0000**
**Fax: (504) 592-9128**

**LAND RECORDS DIVISION**
**1340 Poydras Street, 4th Floor**
**New Orleans, Louisiana 70112**
**civilclerklandrecords@orleanscdc.com**
**Telephone: (504) 407-0005**

*Chelsey Richard Napoleon*
Clerk of Court and Ex-Officio Recorder

**STATE OF LOUISIANA**
**PARISH OF ORLEANS**

I, Gwendolyn Cameron-Allen, Deputy Clerk for the Civil District Court for the Parish of Orleans, do hereby certify that the attached 178 pages are a ***true and correct*** certified copy of the entire proceeding entitled:

**CASE NO.: 2026-07750** **DIVISION: N-8**

**CALLAN MARINE, LTD**

**VERSUS**

**C & C MARINE AND REPAIR, LLC**

**IN TESTIMONY WHEREOF**, I have hereunto set
My hand and affixed the seal of said Court at
New Orleans, Louisiana, on this
25th day of August 2026

Gwendolyn Cameron-Allen
Deputy Clerk, Orleans Parish
***Chelsey Richard Napoleon, Clerk of Court***
Office of the Orleans Parish Clerk of Court
421 Loyola Avenue, Room 402
New Orleans, Louisiana 70112

2026-07750
N
Section 13

FILED
2026 AUG 24 P 05:31
CIVIL
DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2026-________ DIV. "____"

CALLAN MARINE, LTD

VERSUS

C & C MARINE AND REPAIR, LLC

FILED: ______________________ ______________________
DEPUTY CLERK

**PETITION / MOTION TO VACATE ARBITRATION AWARD**

**NOW INTO COURT,** through undersigned counsel, comes Petitioner, Callan Marine, Ltd. ("Callan"), who, pursuant to La. R.S. 9:4210, moves this Honorable Court for an order vacating the Final Liability Award issued on May 26, 2026, and Final Damage Award dated August 3, 2026 and issued on August 13, 2026, in the arbitration between Callan and Defendant, C & C Marine and Repair, LLC ("C&C"), and for entry of judgment vacating said awards and ordering that the claims originally asserted in the underlying proceeding be resubmitted for arbitration. In support of this Petition / Motion, Callan avers as follows:

**PARTIES**

1. Callan is a limited partnership licensed to and doing business in Louisiana, with its principal place of business in Galveston County, Texas.

2. C&C is a Louisiana limited liability company, domiciled in Belle Chasse, Louisiana.

**JURISDICTION AND VENUE**

3. Jurisdiction is proper in this Court pursuant to Article V, § 16 of the Louisiana Constitution.

4. Venue is proper in this Court pursuant to the Louisiana Binding Arbitration Law (La. R.S. 9:4201, *et seq.*), particularly La. R.S. 9:4210, which provides that an application to vacate an arbitration award is to be filed in the state district court in and for the parish in which the award was rendered.

E-Filed

## FACTUAL BACKGROUND

5. Callan and C&C entered into a Vessel Construction Agreement for One (1) 32" Cutter Suction Barge, dated November 5, 2021, regarding the construction of a Cutter Suction Barge that is now known as the General Arnold, wherein they agreed to arbitrate any and all potential disputes thereunder pursuant to the following terms:

> 25.3 All disputes arising out of or relating to this Agreement (except disputes for which Owner is entitled to injunctive relief under Article 6.3 and disputes which are to be resolved in accordance with Article 5.5) shall be submitted to and resolved exclusively through arbitration. On written demand of either party to invoke arbitration, each shall select an arbitrator and notify the other of the arbitrator so selected within three (3) days of such demand. The arbitrators shall then select a third arbitrator within three (3) days. If any party or the two arbitrators fail to timely appoint an arbitrator, the arbitrator shall be selected by the American Arbitration Association ("AAA"). The arbitrators shall decide on each issue or dispute presented to them by a majority vote. In all circumstances, the arbitration shall be conducted in New Orleans, Louisiana, but unless otherwise mutually agreed to, shall not be administered by the AAA. Alternatively, the parties may agree to appoint a single arbitrator with appropriate skill, knowledge and experience relevant to the dispute in order to obtain an expedient ruling. Such arbitrator shall endeavor to resolve a matter brought to him within thirty (30) days.
>
> 25.2 [*sic*] To invoke arbitration under this Article, either party shall notify the other, and the arbitrator, in writing, setting forth:
>
> 1.1.1. [*sic*] The issue to be arbitrated; and
>
> 1.1.2. [*sic*] That arbitration is demanded.
>
> 25.3 [*sic*] The arbitrators shall not be bound by the rules of evidence or civil procedure, but rather may consider such writings and oral presentations as reasonable shipbuilders and businessmen would use in the conduct of their day-to-day affairs, and may require the parties to submit some or all of their presentation orally or in written form as the arbitrators may deem appropriate. The arbitrators shall issue a reasoned award that explains the material facts, quantification of any monetary award and conclusions of law upon which the ruling and award is based.
>
> 25.4 [*sic*] The parties may follow such rules and procedures as are agreed to between the parties. If the parties cannot agree to such rules and procedures within two (2) days of an election to submit the dispute to arbitration, then the Commercial Arbitration Rules of the American Arbitration Association shall apply.
>
> 25.5 [*sic*] The decision of the arbitrator panel regarding any Dispute shall be binding upon the parties and non-appealable but shall be enforceable in any court having jurisdiction.

*See* November 5, 2021 Vessel Construction Agreement for One (1) 32" Cutter Suction Barge, attached hereto as Exhibit "A".

6. On February 4, 2025, Callan served a Demand for Arbitration on C&C. Subsequently, on August 28, 2025, Callan served its Second Amended and Restated Demand for Arbitration. *See* Callan's Second Amended and Restated Demand for Arbitration, attached hereto as Exhibit "B".

FILED
2026 AUG 24 P 05:31
CIVIL
DISTRICT COURT

7. On September 13, 2025, C&C served its Answer and Affirmative Defenses to Callan's Second Amended and Restated Demand for Arbitration, which also incorporated a Counterclaim that C&C had previously served on Callan on August 8, 2025. *See* C&C's Answer, Affirmative Defenses, and Counterclaim, attached hereto as Exhibit "C". Callan had previously answered C&C's Counterclaim on August 28, 2025. *See* Callan's Answer to Counterclaim, attached hereto as Exhibit "D".

8. Prior to the arbitration of the matter, the panel of three (3) appointed arbitrators ("the Arbitration Panel") entered its January 15, 2026 Order on C&C's Motion for Partial Summary Judgment. *See* January 15, 2026 Order, attached hereto as Exhibit "E".

9. Following that Order, an arbitration hearing was held on March 2–6, 2026, in New Orleans, Louisiana. During that hearing, Callan and C&C each presented testimony and evidence to the Arbitration Panel concerning the parties' respective liabilities for the claims asserted.

10. On May 26, 2026, the Arbitration Panel entered a Final Liability Award, attached hereto as Exhibit "F". The Final Liability Award dismisses Callan's breach of contract claim, holding that only a warranty claim was available to Callan to remedy C&C's breach of contractual provisions requiring the vessel to meet certain specifications and criteria. *See* Exhibit F, at p. 24. Accompanying the Final Liability Award was one arbitrator's Dissent on the Issue of Duress, dated May 22, 2026. *See id.* at pp. 30-38.

11. Another arbitration hearing was held on June 22–23, 2026, this time concerning the damages recoverable by Callan under the Final Liability Award. Following this hearing, the Arbitration Panel requested additional information and documents from Callan.

12. On August 13, 2026, the Arbitration Panel served a Final Damage Award, dated August 3, 2026, attached hereto as Exhibit "G," rejecting the majority of Callan's damages, awarding pre-award interest based on Louisiana law for tort claims (as opposed to contractual claims), and denying any award of costs to Callan without reasons therefor.

13. The bases for the Final Liability Award and Final Damage Award are not predicated on any agreed contractual terms; rather, they are founded upon a knowing and manifest disregard for the law, an imperfect and prejudicial execution of the Arbitration Panel's authority, and the contemplation of undisclosed facts and opinions derived from one or more of the panelists' prior

and unrelated work experiences, which facts and opinions were not subject to cross-examination or other notice and were thus prejudicial to Callan. The cumulative effect of these vices amounts to a deprivation of the standards of due process to which Callan was entitled and of which the Arbitration Panel was obligated to abide by.

14. Pursuant to La. R.S. 9:4210, an arbitration award shall be vacated

> A. Where the award was procured by corruption, fraud, or undue means.
>
> B. Where there was evident partiality or corruption on the part of the arbitrators or any of them.
>
> C. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced.
>
> D. Where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

La. R.S. 9:4210.

15. The statutory bases for vacating an arbitration award are closely tied to the preservation of due-process rights and fundamental fairness, and "an arbitrator should be constantly vigilant of basic due process requirements, the first and foremost of which is the opportunity to present evidence and to be heard. Counsel should be afforded the opportunity to present their objections on the record. The arbitrator should respond, on the record, to those objections. The necessity of a transcript of all the proceedings is fundamental." *Pittman Const. Co., Inc. v. Pittman*, 96-1079 (La. App. 4 Cir. 3/12/97), 691 So. 2d 268, 274, *writ denied*, 97-0960 (La. 5/16/97), 693 So. 2d 803.

16. Recognizing the fundamental nature of these rights to the arbitration process, Louisiana's Courts of Appeal have "made it clear that due process violations require a reviewing court to vacate [an] award." *Mayeaux v. Skyco Homes*, 2013-1053 (La. App. 3 Cir. 7/2/14), 161 So. 3d 765, 768; *see also Johnson v. 1425 Dauphine, L.L.C.*, 10-793 (La. App. 4 Cir. 12/1/10), 52 So. 3d 962, 968-69, *writ denied*, 11-01 (La. 2/18/11), 57 So. 3d 334 (*citing Haase Const. Co., Inc. v. Strohmeyer*, 98-2967 (La. App. 4 Cir. 6/23/99), 738 So. 2d 152, 154-55); *Pennington v. Cuna Brokerage Securities, Inc.*, 2008-0589 (La. App. 1 Cir. 10/1/08), 5 So. 3d 172, 176, *writ denied*, 2008-2600 (La. 1/9/09), 998 So. 2d 723.

2026-07750
N
Section 13

FILED
2026 AUG 24 P 05:31
CIVIL
DISTRICT COURT

17. Certain of the enumerated grounds for vacatur of an arbitration award undermine the Final Liability Award—and, accordingly, the Final Damage Award—issued by the Arbitration Panel.

18. As to the first ground, the Final Liability Award is tainted by misrepresentations and other undue means. To wit, C&C elicited testimony suggesting that its third-party subcontractors had agreed to perform many repairs under warranty provisions of the Vessel Construction Agreement, despite knowing that those third-party subcontractors had previously charged Callan significant sums of money to make those repairs during 2024 and 2025. The Final Liability Award demonstrates that the Arbitration Panel treated these statements as material considerations in reaching its ruling. *See* Exhibit F, at p. 16, ¶ 82.

19. The Arbitration Panel also founded its ruling upon facts and opinions derived from the pre-panel work experience of one or more of the panelists. Such facts and opinions were not shared with or disclosed to the parties. Moreover, the Arbitration Panel did not provide Callan with notice of what matters would be considered or allow Callan the opportunity to object or present additional evidence in response to those undisclosed matters and other information that the panelists apparently considered before all the evidence was presented in reaching the Final Liability Award.

20. As to the third ground, the Arbitration Panel substantially limited Callan's presentation of testimony from its expert, but then overruled Callan's objections to testimony from C&C's expert and lay witnesses on substantially similar and comparably material topics with no justifiable explanation as to their distinctions in application. Such conduct was significantly prejudicial to Callan, depriving Callan of a fair opportunity to be heard as to pertinent and material aspects of its claims.

21. As to the fourth ground, the Arbitration Panel exceeded its power in dismissing Callan's breach of contract claim against C&C by, *inter alia*, creating a new contract between the parties based on the testimony that certain non-functioning or missing equipment had been—or would in the future be—remedied under third-party warranties. No such terms exist in the governing agreement, and the Final Liability Award recognized that no such terms could be

2026-07750
N
Section 13

FILED
2026 AUG 24 P 05:31
CIVIL
DISTRICT COURT

supplied through extrinsic evidence given a purported lack of ambiguity to the written terms of the Vessel Construction Agreement. *See* Exhibit F, at pp. 2, 22.

22. The Vessel Construction Agreement clearly and unambiguously established that all machinery and equipment associated with the constructed vessel was required to be integrated and in working and functional order before C&C delivered the constructed vessel to Callan. The evidence was unrebutted that this machinery and equipment either was not on the vessel or was not functional at the time Callan took possession of the vessel. With knowledge of and in spite of these unrebutted facts and the applicable legal standards which it was obligated to apply, the Arbitration Panel nonetheless ruled that C&C could not be held liable for breach of contract to Callan, which is a conscious and gross deviation from the law that the Panel acknowledged applied to Callan's claims.

23. Moreover, by relying on facts not presented and one or more of the panelists' individual opinions from prior experience in lieu of the undisputed facts and evidence presented by the parties, the Arbitration Panel so imperfectly executed its duties and powers that a mutual, final, and definitive award was not made.

24. The arbitration record reflects that the Arbitration Panel was aware of the terms of the contract and controlling principles of Louisiana law, yet consciously chose not to apply them, amounting to a violation of La. R.S. 9:4210 and a material deficiency in the bases of the Final Liability Award and Final Damage Award.

25. Rather than merely erring or misunderstanding the applicable law, the Arbitration Panel showed a knowing and manifest disregard for the laws it was bound to apply, including by predicating its decisions upon information and materials outside of the arbitration proceeding rather than those presented in evidence by the parties during the hearing.

26. In lieu of acting as a neutral factfinder and adjudicator, the Arbitration Panel simply imposed its own views, policy choices, and/or feelings upon the parties' and their positions, all in direct conflict with the legal principles and authorities governing the dispute. The Arbitration Panel had no authority to so act or make such an award.

27. The foregoing violations of La. R.S. 9:4210 culminate in a deprivation of Callan's fundamental right to due process in the adjudication of its claims, including through the denial of



E-Filed

2026-07750
N
Section 13

FILED
2026 AUG 24 P 05:31
CIVIL
DISTRICT COURT

sufficient notice of the facts, issues, and evidence considered by the Arbitration Panel and the opportunity to object or present additional evidence in response.

28. Callan requests an evidentiary hearing concerning the factual underpinnings of this Petition / Motion.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner, Callan Marine, Ltd., requests that after due proceedings are had herein, this Honorable Court enter an order vacating the Final Liability Award issued on May 26, 2026 and the Final Damage Award dated August 3, 2026, and issued on August 13, 2026, in the arbitration between Callan and Defendant, C & C Marine and Repair, LLC, and for entry of judgment vacating said awards and ordering that the claims originally asserted therein be resubmitted for arbitration, and all other general, equitable, and legal relief to which it may be entitled, including its costs in this proceeding.

Dated: August 24, 2026

Respectfully submitted,

**RANDALL A. SMITH, T.A. (#2117)**
**J. GEOFFREY ORMSBY (#24183)**
**DYLAN T. LEACH (#35879)**
**JOHN M. ROSSI, JR. (#41917)**
Of
**SMITH & FAWER, L.L.C.**
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Telecopy: (504) 525-2205
rasmith@smithfawer.com
gormsby@smithfawer.com
dleach@smithfawer.com
jmrossi@smithfawer.com

*Counsel for Petitioner,*
*Callan Marine, Ltd.*

**PLEASE PREPARE CITATION**
**AND SERVE:**

**C&C Marine and Repair, LLC**
*through its registered agent for service of process*:
Anthony Cibilich
701 Engineers Road
Belle Chasse, Louisiana 70037



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

VESSEL CONSTRUCTION AGREEMENT

**BY AND BETWEEN**

**C&C MARINE AND REPAIR LLC**
**(Builder)**
**AND**
**CALLAN MARINE LTD.**
**(Owner)**
**ONE (1) 32" CUTTER SUCTION DREDGE**

**TABLE OF CONTENTS**

ARTICLE 1 – DEFINITIONS
ARTICLE 2 – SCOPE AND PRICE
ARTICLE 3 – DESIGN OWNERSHIP
ARTICLE 4 – DOCK TRIALS AND TESTING; AND DELIVERY
ARTICLE 5 – PAYMENT
ARTICLE 6 – PROSECUTION OF THE WORK AND PROJECT SCHEDULE
ARTICLE 7 – FORCE MAJEURE
ARTICLE 8 – LIQUIDATED DAMAGES FOR DELAY
ARTICLE 9 – CHANGES IN THE WORK
ARTICLE 10 – INSURANCE
ARTICLE 11 – WARRANTY
ARTICLE 12 – FINANCIAL SECURITY
ARTICLE 13 – ELIMINATION OF INCIDENTAL & CONSEQUENTIAL DAMAGES
ARTICLE 14 – DEFAULT AND TERMINATION
ARTICLE 15 – APPLICABLE LAW
ARTICLE 16 – CONTRACT
ARTICLE 17 – INSPECTION, ACCESS, TESTS AND OFFICIAL CERTIFICATES
ARTICLE 18 – ASSIGNMENT OF THE AGREEMENT
ARTICLE 19 – COMPLIANCE WITH REGULATIONS
ARTICLE 20 – INTELLECTUAL PROPERTY
ARTICLE 21 – NOTICES AND COMMUNICATIONS
ARTICLE 22 – TITLE AND ECURITY
ARTICLE 23 – INDEMNIFICATION



VERIFIED
EXHIBIT A
Valerie West
2026 AUG 25 A 09:49

E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

ARTICLE 24 – NOT USED
ARTICLE 25 – DISPUTE RESOLUTION
ARTICLE 26 – TAXES, DUTIES AND CONTRACT EXPENSES
ARTICLE 27 – LIENS AND ENCUMBRANCES
ARTICLE 28 – NOT USED
ARTICLE 29 – GENERAL

LIST OF EXHIBITS


| | |
|---|---|
| Exhibit A | Vessel Contract Price and Delivery Date |
| Exhibit B | Specifications |
| Exhibit C | Contract Drawings |
| Exhibit D | Makers List |
| Exhibit E | Owner Furnished Items |
| Exhibit F-1 | NOT USED |
| Exhibit F-2 | Form of Builder's Invoice |
| Exhibit G | Form of Lien Release and Waiver |
| Exhibit H | Form of Certificate of Completion and Delivery |
| Exhibit I | Form of Change Order |
| Exhibit J | Form of Owner's Warranty Notification to Builder |
| Exhibit K | Builder's Schedule |
| Exhibit L-1 | NOT USED |
| Exhibit L-2 | NOT USED |
| Exhibit M | Form of Protocol of Delivery and Acceptance |
| Exhibit N | NOT USED |
| Exhibit O | Time and Material Rates |
| Exhibit P | Form of Builder Contract Deficiency Report |
| Exhibit Q | Monthly Payment Schedule |




E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

VESSEL CONSTRUCTION AGREEMENT

**THIS VESSEL CONSTRUCTION AGREEMENT** is made as of the 5th day of November, 2021 (hereinafter, "Agreement"), between C&C MARINE AND REPAIR LLC (hereinafter, "Builder"), a limited liability company organized and existing under and by virtue of the laws of the State of Louisiana, whose mailing address is 701 Engineers Road, Belle Chasse, Louisiana 70037, and CALLAN MARINE LTD. (hereinafter, "Owner"), a limited partnership organized and existing under and by virtue of the laws of the State of Texas, whose mailing address is P.O. Box 17017, Galveston, Texas 77552.

Builder and Owner agree as set forth below:

## ARTICLE 1 – DEFINITIONS

"**Affiliates**" shall mean any entity which controls, is controlled by, or is under common control with another entity. An entity is deemed to control another if it owns directly or indirectly at least fifty percent (50%) of (i) the shares entitled to vote at a general election of directors of such other entity, or (ii) the voting interest in such other entity if such other entity does not have either shares or directors.

"**Agreement**" as defined in the Preamble.

"**Builder Group**" has the meaning set forth in Article 23.2.

"**Builder Personnel**" shall mean all employees of the Builder and the employees of any Subcontractor of Builder, at any tier.

"**Certificate of Completion and Delivery**" has the meaning set forth in Article 5.3.

"**Change Order**" shall mean a written instrument prepared by the Builder and signed by the Owner and Builder, stating their agreement upon: (1) a change in the Work; (2) the amount of the adjustment in the Contract Price if any; and (3) the extent of the adjustment in the Delivery Date, if any.

"**Contract**" has the meaning set forth in Article 16.1.

"**Contract Documents**" has the meaning set forth in Article 16.1.

"**Contract Price**" means the price for the Vessel to be constructed pursuant to this Agreement which shall be EIGHTY TWO MILLION AND NO/100 DOLLARS ($82,000,000.00), plus or minus any Modifications thereto and any price adjustments allowed by this Agreement. The Contract Price is based upon U.S. Midwest Domestic Hot Rolled Coil Steel as of April 1, 2021 (@$1,345/ton). If the price of steel is lower as of October 1, 2021, Owner will receive a discount by way of reduction in the Contract Prcie based upon 2,500 tons of steel *multiplied by* the decrease in price as of October 1, 2021.

"**Days**" shall mean calendar days, unless otherwise defined. Each day shall be a single twenty-four hour period commencing at 12:00 a.m.

"**Delivery or Delivered**" shall mean the point of time in the construction process when all required regulatory certificates have been received by Owner, all major equipment has been Dock Tested, and the Vessel is capable of being manned and commencing commercial dredge operations, subject to the warranties set forth in Article 11, as evidenced by Builder's and Owner's execution of a conditional Protocol of Delivery and Acceptance in the form attached as Exhibit M.

"**Delivery Date**" shall mean July 15, 2023 .

"**Delivery Payment**" has the meaning set forth in Article 5.4 and Exhibit Q.



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

"**Delivery Point**" shall mean safely afloat at Builder's shipyard, located at 701 Engineers Road, Belle Chasse, Louisiana 70037, or at another mutually agreed location.

"**Design**" shall mean the design of the Vessel provided by Owner and modified by Builder, as contemplated herein and as described and comprised in Exhibits B and C, and shall also include all documents embodying such design and all Intellectual Property embodied in such design documents, as specified in the Contract Documents.

"**Detailed Construction Documentation**" shall mean all construction documentation of the Vessel provided by the Builder, as specified in Exhibit B.

"**Dock Trials and Testing**" shall mean the testing of any portion of the Work by Builder or Owner prior to, and as a condition to Delivery, as described more particularly in Article 4.

"**Dredge Completion**" means that the Vessel shall be complete upon satisfaction of each of the following (i) when the Vessel completes not less than 3 consecutive days of dredging without major system failures, which initial dredging shall be completed within sixty (60) days of the Vessel leaving the Shipyard, and (ii) all punchlist items have been completed by Builder.

"**Early Completion Bonus**" has the meaning set forth in Article 8.

"**Effective Date**" shall be the date upon which this Agreement has been signed by both parties hereto and Owner has made payment of the initial Monthly Payment in accordance with Exhibit Q.

"**Extended Delivery Date**" shall mean the date on which the Vessel is required to be delivered to Owner, as adjusted pursuant to this Agreement.

"**Final Acceptance**" has the meaning set forth in Article 4.7.

"**Final Acceptance Payment**" has the meaning set forth in Article 5 and Exhibit Q.

"**Force Majeure**" has the meaning set forth in Article 7.1.

"**Good Shipbuilding Practice**" means the construction of a vessel or dredge, with due consideration to good quality, incorporating the specified components in order to meet Specification requirements, utilizing construction and testing methods to ensure that the completed ship will conform to the Contract Documents.

"**Intellectual Property**" means all trade names, trademarks, service marks and other identifying names or source indicia associated with the Work, whether registered or unregistered, and including all goodwill relating to any of the foregoing, and all applications for any of the foregoing; all patents, copyrights, including any design copyrights protected pursuant to 17 U.S.C. § 1301, et seq., copyright registrations and patent applications therefore, together with all divisions, renewals and continuations of any of the foregoing, and all know-how, unpatented inventions, trade secrets and other intellectual property embodied in or pertaining to the Work or the Design.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Lien Release**" shall mean a lien release in favor of the Vessel and Owner executed by Builder in the form of Exhibit G.

"**Materials**" shall mean everything that is required for the construction and Delivery of the Vessel in compliance with the Specifications, including, without limitation, all materials, supplies, machinery, machinery parts, equipment, electronics, hardware, piping, timber, ferrous and non-ferrous plate, shapes and other tangible items that are incorporated or used in or that are identified to or intended to be incorporated or used in the construction of the Vessel.

"**Modification**" shall mean (1) a written amendment to the Contract signed by both parties, or (2) a Change Order. All Contract Documents, written amendments, if any, and Change Orders shall be effective only if signed by a designated representative of Owner and Builder as set forth in Article 21.



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

"**Monthly Payment**" shall mean a monthly payment due in accordance with Article 5.2 and Exhibit Q.

"**Owner**" has the meaning set forth in the Preamble.

"**Owner Furnished Items**" shall mean those items that are part of the Work as defined in Exhibit E.

"**Owner Group**" has the meaning set forth in Article 23.1.

"**Owner Personnel**" shall mean all employees of the Owner, the Owner's representative, and the employees of any subcontractor of Owner (excluding Builder Personnel), at any tier.

"**Person**" means an individual, or any corporation, partnership, limited liability company, joint venture, association, joint--stock company, trust, unincorporated organization or government or agency or political subdivision thereof (including any subdivision or ongoing business of any such entity or substantially all of the assets of any such entity, subdivision or business).

"**Project Schedule**" has the meaning set forth in Article 6.4.

"**Protocol of Delivery and Acceptance**" means a document in the form of Exhibit M to be executed by Builder and Owner upon Delivery of the Vessel.

"**Regulatory Authorities**" shall mean the United States Coast Guard, the American Bureau of Shipping ("ABS"), International Maritime Organization, Customs and Border Protection, Environmental Protection Agency and any other applicable governmental body or agency responsible for ensuring the Vessel's compliance with all requirements imposed by United States law, regulation, convention or other requirement applicable to the Vessel.

"**Sea Trials**" shall mean the testing done in the Mississippi River, in the vicinity of the Builder's shipyard, to demonstrate the Vessel can perform dredging operation necessary to satisfy Dredge Completion."

"**Shipyard**" means Builder's shipyard located at 701 Engineers Road, Belle Chasse, Louisiana U.S.A. 70037, which is the location at which the Vessel will be constructed.

"**SLOC**" has the meaning set forth in Article 12.

"**Specifications**" means the specifications set forth in Exhibit B, which shall be provided by Builder within one hundred twenty (120) days after execution of this Agreement.

"**Subcontractor**" means any person other than employees, engaged by the Builder to execute any part of the Work under this Agreement on behalf of the Builder.

"**Supplier**" means any person responsible for the supply, manufacture, construction, installation or delivery to the Builder of any of the Materials.

"**Vessel**" shall mean the 32" cutter suction dredge, which is to be constructed by Builder in accordance with this Agreement, bearing Builder's Hull No. 374.

"**Warranty Manager**" has the meaning set forth in Article 11.1.

"**Warranty Period**" shall mean a 365-day period following Delivery of the Vessel, or in the case of a warranty given by a third party, such period specified in such warranty.

"**Work**" means the work required to be performed by Builder in accordance with the Contract Documents, whether performed by Builder or any Subcontractor of the Builder and whether completed or partially completed, and includes all labor, Materials, equipment and services provided or to be provided by or on behalf of Builder to fulfill the Builder's obligations hereunder. The Work shall also include Builder's obligation to pay in due course for all such labor, Materials, equipment and services provided or to be provided on behalf of Builder to fulfill the Builder's obligations.

"**Working Days**" shall mean "**business days**", Monday through Friday, excluding holidays and weekends.

Terms defined in this Agreement, which are used in the other Contract Documents or Change Orders but not otherwise defined therein, shall have the meanings designated in this Agreement.



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

## ARTICLE 2 – SCOPE OF WORK AND PRICE

2.1 The object of the Contract is the design and construction by the Builder of one (1) Vessel, which shall be a 32" cutter suction dredge, for the Contract Price, all in accordance with the Contract Documents and to be Delivered to Owner on or before the Delivery Date. The Vessel will be built similar to the CSD General MacArthur, modified as described in Article 2.2. The same equipment, or equal, shall be purchased as the CSD General MacArthur. The Vessel will be classed by ABS with Load Line and COI.

2.2 For the Contract Price, Builder agrees, at its own risk and expense, to modify the design of the CSD GENERAL MACARTHUR to incorporate four (4) GE engines and build at the Shipyard, complete and deliver to Owner, afloat at the Delivery Point, on or before the Delivery Date, the Vessel, which at the time of Delivery shall be staunch and seaworthy and constructed, outfitted and tested in accordance with the Design as indicated in the Contract Documents. The Contract Price to be paid by the Owner for the Work for the Vessel may only be adjusted in accordance with the terms of this Agreement.

2.3 Within one hundred twenty (120) days after execution of this Agreement, Builder shall provide an agreed makers list, specifying the sourcing for all major Vessel components and their specifications (the "Makers List") which shall be attached hereto as Exhibit D. The Makers List may be supplemented and/or amended by agreement of Owner and Builder as the Project progresses. It is expressly agreed and understood that Builder will not deviate from the Makers List without the prior written acceptance and agreement of Owner Additionally, the parties acknowledge and agree that the Contract Price of the Vessel includes all Materials and Equipment required by the Contract Documents.

2.4 Within one hundred twenty (120) days after execution of this Agreement, Builder shall provide Specifications, specifying the Design of the Vessel which shall be attached hereto as Exhibit B. The Specifications may be supplemented and/or amended by agreement of Owner and Builder as the project progresses.

2.5 Builder has made arrangements for a suitable location at the Shipyard for the full and timely construction of the Vessel together with all labor, management, tools, equipment, Materials, services and fees necessary for the construction, completion, inspection and certification of the Vessel, except as otherwise indicated in the Contract Documents. The cost of the Shipyard is included in the Contract Price and shall be paid directly by Builder.

2.6 Not used.

2.7 Subject to Article 19, Builder will comply with and construct the Vessel to be in compliance with the requirements of governing Regulatory Authorities. All fees and charges of a Regulatory Authority shall be for the account of and paid by the Builder, except as otherwise set forth herein.

2.8 Subject to Article 19, in the construction of the Vessel, Builder will not knowingly violate the applicable requirements of Regulatory Authorities which have jurisdiction and which are in effect or announced to come into effect on the date of this Agreement. In the event Builder becomes aware that any portion of the Contract Documents do not comply with such rules, regulations and requirements of the Regulatory Authorities, the Builder shall promptly notify Owner of said non-compliance and Builder and Owner shall agree on the Modifications necessary to secure compliance and any alterations in the Work caused by such changes shall be the subject of a Change Order without adjustment to the Delivery Date and Contract Price of the Vessel. If there are changes after the execution of this Agreement to the rules and regulations promulgated by the United States or other Regulatory Authorities applicable to the Vessel, alterations in the Work caused by such change shall be subject to a Change Order which may also adjust the Delivery Date and the Contract Price for each affected Vessel as agreed by the parties.

2.9 Builder will allow Owner and/or its representatives at all reasonable times to examine the Vessel and the Work during construction.

2.10 The parties accept the relationship of trust and confidence established between them by this Agreement.

2.11 It is understood that Builder is an independent contractor in the performance of the Work, maintaining complete control of its workers, the worksite and its operations. Neither Builder nor anyone employed or engaged by it shall become an agent, representative, servant or employee of Owner in the



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

performance of the Work or any part of it. Owner shall have no right or authority to supervise, direct, instruct or otherwise give orders to Builder's personnel, subcontractors or suppliers, or to bind Builder in any way to any third party. Builder shall have no power whatsoever to bind the Owner in any way in any dealings between Builder and third parties and shall not attempt or purport to do so. All portions of the Work that Builder does not perform shall be performed under subcontracts or other appropriate agreement between Builder and the Subcontractor performing the Work, and Owner shall have no liability for such Subcontracts. Nothing contained in the Contract Documents shall create any contractual relationship between Owner and any Subcontractor of the Builder. Notwithstanding the foregoing, for informational purposes only, Builder shall furnish to Owner at its request a copy of each material subcontract it enters into in connection with the Work, subject to Builder's right to redact such pricing information as Builder deems necessary and appropriate.

## ARTICLE 3 – DESIGN OWNERSHIP

The Design, the Specifications, Contract Documents and any Detailed Construction Documentation prepared for the Builder or its Subcontractors that have passed on ownership, in connection with the Design or the Work and any Intellectual Property they embody shall, upon payment of the Contract Price, be and remain the sole and exclusive property of the Owner. Nothing contained herein shall be deemed to transfer any right of title or ownership of any Intellectual Property to Builder and nothing herein contained shall be deemed to limit Owner's right to use such Intellectual Property, except that Builder shall retain all rights in the ShipConstructor 3-D Model of the Vessel. For the avoidance of doubt, Builder shall not be permitted to use the ShipConstructor 3-D Model of the Vessel (Hull. No. 374) for any other purpose or for any other customer or vessel construction. This clause supercedes language on ownership of Intellectual Property in the Confidentiality and Non-Disclosure Agreement as agreed between the parties.

## ARTICLE 4 – DOCK TRIALS AND TESTING; DELIVERY

4.1 Owner shall, at its own expense, have the right at any time during normal business hours to inspect the Vessel and the Work and the progress being made in the Work and further shall have the right to have any qualified person of its choosing make inspection and examination of the Vessel in various stages of construction, subject to Builder's right to deny access to any person who, in Builder's reasonable opinion, does not comply with Builder's health, safety, or security policies. Owner shall be responsible for promptly notifying Builder in writing if there is any complaint as to the satisfactory accomplishment of the Work that is observed by the Owner.

4.2 Prior to installation or incorporation into the Vessel, all machinery, equipment and systems, will be tested to ensure its proper operation in accordance with agreed factory acceptance test (FAT) protocols to be established by Builder and its vendors. Materials and consumables necessary for any and all operational testing, including but not limited to all fluids and filters shall be furnished by and for the account of Owner, and all other Materials and consumables shall be furnished by and for the account of Builder.

4.3 Dock Trials and Testing

(a) When Builder has completed the Work on the Vessel, the Vessel will undergo Dock Trials and Testing to demonstrate that: (i) the Work is complete in accordance with the Contract Documents, (ii) that the Vessel has satisfied the conditions for Delivery; and (iii) all the Vessel's machinery, equipment and systems operate in accordance with the Contract Documents. Owner will be given a minimum seven (7) day advance notice of the scheduled dates for Dock Trials and Testing. Builder shall provide at least one (1) electrician and one (1) mechanic during Dock Trials and Testing, as well as the Sea Trials. During the Dock Trials and Testing, the Vessel may be inspected by the Regulatory Authorities, Builder and Owner.

(b) Upon completion of Dock Trials and Testing and correction of any identified defective or non-compliant Work, Delivery shall take place, and the Vessel shall be deemed Delivered pursuant to this Agreement. Following Delivery, the Vessel shall be mobilized to a location on the Mississippi River in the vicinity of Builder's Shipyard to undergo Sea Trials and satisfaction of Dredge Completion.



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

(c) If at the conclusion of Dock Trials and Testing the Vessel fails to satisfy the conditions of Delivery and is unsuitable to commence commercial dredging operations, Owner will promptly, and in any event within two (2) Working Days after discovery of such non-compliant Work, notify Builder in writing through the issuance of the Contract Defiency Report attached hereto as Exhibit P.

(d) Any deficiencies identified during Dock Trials and Testing will be corrected at the testing location, if possible. If it is not possible to correct deficiencies at the testing location, the Vessel will be towed back to Builder's Shipyard and corrective work shall be performed within seven (7) days after arrival. Dock Trials and Testing shall be re-performed in accordance with the above to confirm correction of identified deficiencies and satisfaction of the requirements for Delivery.

4.4 Owner shall provide to Builder a Contract Deficiency Report in the form of Exhibit P as a means to communicate items that need to be addressed by the Builder before Delivery is completed. It is expressly agreed and understood that issuance, or failure to issue, a Contract Deficiency Report by Owner shall not constitute waiver or acceptance of any conditions.

4.5 Builder shall Deliver the Vessel to Owner in accordance with this Agreement on or before the Delivery Date or Extended Delivery Date, as the case may be, free and clear of liens and encumbrances and with Lien Release(s) in the form of Exhibit G, as required by Article 5.6.

4.6 Delivery shall be made safely afloat at the Shipyard, or at a location mutually agreed by Owner and Builder.

4.7 Final Acceptance of the Vessel shall not be deemed to have taken place until Delivery, Dredge Completion, and all punchlist items listed in the Contract Defiency Report have been completed or when Owner decides to put the Vessel to work. Completion of the Vessel's production optimization automation system is not a requirement of Final Acceptance if Owner fails to provide a working programming to Builder by January 31, 2022

## ARTICLE 5 – PAYMENT

5.1 The Work shall be performed by Builder in consideration of the Owner's payment of the Contract Price for the Vessel set forth in Exhibit A of this Agreement, as may be modified by approved and executed Change Orders.

5.2 Owner agrees to pay the Contract Price for the Vessel to Builder in Monthly Payments, which shall be due and payable by Owner on the first day of each month following the execution of this Agreement until Delivery and which shall correlate to the schedule as set forth in Exhibit Q. If Builder delivers the Vessel before the Delivery Date, and/or the Extended Delivery Date, as specified in the contract, then the remaining scheduled monthly payments shall be paid at the time of Delivery as set forth in Exhibit Q.

5.3 As of the time of Delivery of the Vessel, Builder shall have executed and delivered to Owner 1) a Certificate of Completion and Delivery in the form of Exhibit H (including all documents listed therein) stating (i) that the Vessel has been completed in accordance with the Contract Documents; (ii) that all Dock Trials and Testing have been satisfactorily completed pursuant to Article 4.3; (iii) that the Vessel complies with the Contract Documents is free from known defects in Builder's Materials and workmanship and is capable of being manned and commencing commercial dredge operations; 2) a final lien waiver from Builder, in the form of Exhibit G; 3) the Detailed Construction Documentation; 4) an operational manual for the Vessel's mechanical and electrical systems, and specific parts, maintenance and operational manuals for each individual piece of equipment installed on the Vessel; 5) any other documents set forth in the Specifications; and 6) any other document reasonably required by Owner, by applicable law or by any Regulatory Authority in order for the Owner to have the Vessel documented in the Owner's name and to allow the Vessel to commence operations as a dredge, the foregoing being collectively referred to as the "Delivery Documents". Builder shall not be responsible for any regulatory certificates that are required for crewing and/or manned operation purposes and are to be organized by Owner. Furthermore Builder is not responsible for any manuals or plans related to crew safety or safety procedures. Upon receipt of all Delivery Documents, Builder shall execute and deliver to Owner a Protocol of Delivery and Acceptance in the form set forth in Exhibit M, which shall be expressly conditioned and contingent upon Dredge Completion.



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

5.4 Upon satisfaction of the conditions of Delivery of the Vessel, Owner and Builder shall execute a conditional Protocol of Delivery and Acceptance and Owner shall pay Builder:

1.1.1. The Delivery Payment indicated in Exhibit Q;

1.1.2. *Plus* any and all time and material payments that have not been paid to date;

1.1.3. *Plus* any applicable State or Local Sales and/or Use Taxes, unless Owner has provided to Builder documents required by Louisiana law to obtain a sales or use tax exemption (Builder agrees to provide reasonable assistance as requested by Owner for obtaining any available exemption(s));

1.1.4. *Plus* or *less* any changes in the Contract Price resulting from fully executed Change Orders that have not been paid or credited prior to Delivery;

1.1.5. *Plus* the value of any stores provided by the Builder on board at time of Delivery;

1.1.6. *Plus* any Early Completion Bonus payments that may be due to Builder in accordance with Article 8;

1.1.7. *Less* any liquidated damages for delay that may have accrued in accordance with Article 8 below.

If the amount of liquidated damages payable pursuant to Article 8 shall exceed the sum of (.1) through (.6), above, Builder shall pay the difference to Owner in cash at the time of Delivery.

5.5 Upon Dredge Completion, Owner shall pay Builder the Final Acceptance Payment, as designated in Exhibit Q, together with any approved and unpaid time and materials payments outstanding and any approved and unpaid Change Orders that have not been paid or credited prior to the Dredge Completion date.

5.6 In the event of any dispute between the parties at the time of Delivery, the parties shall reserve their respective rights regarding the dispute and Delivery of the Vessel shall be made subject to such reservation. Builder shall not withhold or otherwise delay or encumber the Delivery of the Vessel and Owner shall not withhold acceptance of the Vessel or the payment of all amounts indicated in Article 5.4

5.7 All payments will be due by wire transfer unless otherwise specified herein. Builder and Owner shall furnish wire transfer instructions to the other party. Any and all late payments shall accrue interest at the prime rate reported by Wall Street Journal from the date that the payment was due until paid.

5.8 Payments by Owner shall be without prejudice to all rights, defenses and remedies of Owner in respect of the Vessel and this Agreement.

5.9 Additions, deletions or extra items requested by Owner from the Contract Documents must be agreed upon by both Owner and Builder, in writing, prior to commencement of Work pertaining thereto, in accordance with Article 9 below. Any increase or decrease in the Contract Price from a change or adjustment agreed to in accordance with Article 9 shall be deemed a part of the Contract Price. Where the increase or decrease in the Contract Price has not been agreed upon or determined, Monthly Payments shall be estimated based on the midpoint between the Builder's and Owner's independent estimates of the increase or decrease in the Contract Price due to such change or adjustment, unless Owner and Builder agree otherwise; provided that at the time the increase or decrease in the Contract Price is agreed upon or determined, an appropriate adjustment in the level of Monthly Payments shall be made to reflect any variance between the estimate and the agreement or determination.

5.10 In the event that an increase or decrease in the Contract Price due to change or adjustment under Article 9 below is not mutually agreed to prior to Delivery of the Vessel to Owner, appropriate adjustment of any overpayment or underpayment shall be made promptly upon final determination in accordance with Article 25 as to the increase or decrease and any adjustments required to the Contract Price shall be paid or refunded within ten (10) days.



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

ARTICLE 6 – PROSECUTION OF THE WORK AND PROJECT SCHEDULE

6.1 Builder shall provide at no charge other than the Contract Price, all things required for the complete performance of the Work, except for such items as are specifically required by the Contract Documents to be furnished by Owner. Builder shall at all times prosecute the Work diligently so as to ensure its completion in full accordance with the Contract Documents within the time required for delivery of the Vessel by the Delivery Date. Builder shall at all times furnish sufficient numbers or amounts of properly skilled and qualified workers, acceptable materials and equipment and adequate services and tools and equipment necessary for the Work and the delivery of the Vessel by the Delivery Date.

6.2 Builder shall perform all of the Work in accordance with Good Shipbuilding Practices, all applicable laws, applicable codes and standards, and the Contract Documents. To the extent provided by Builder, all engineering and design services shall be provided utilizing Good Shipbuilding Practices and the generally accepted standard of care, skill and diligence as would be provided by an engineering or naval architecture firm experienced in supplying engineering or naval architecture services nationally to the U.S. maritime industry. The Vessel shall be constructed in a good and workmanlike manner and in accordance with the standards set forth in the Specifications, Contract Documents, and the requirements of the governing Regulatory Authorities.

6.3 Builder understands that time is of the essence for the Owner and that an essential cause of this Agreement and fundamental reason that Builder's proposal has been selected and that Owner has entered into this Agreement with Builder is the representation by Builder and the commitment made in this Agreement that, except for causes of Force Majeure or other delays excused in accordance with the terms of this Agreement, Builder can and will perform the Work and can and will deliver the Vessel by the Delivery Date shown on Exhibit A. In the event that the Builder cannot complete and deliver the Vessel by its Delivery Date, Builder will work with full dispatch in order to complete the Vessel in the most timely manner reasonably achievable by Builder. Builder shall not, under any circumstances, make a decision that it is more economically advantageous for Builder to pay liquidated damages than to allocate available resources to the construction of the Vessel that, if so allocated would prevent the delay or lessen the delay and Owner shall have the right to an injunction to prevent any such action by Builder.

6.4 No later than thirty (30) days following the execution of this Agreement, Builder shall submit to Owner a detailed at minimum Level 1) project schedule and execution plan, including critical path items and interim inspection dates for key components (minimum 3 days' notice), to be attached hereto as Exhibit K (the "Project Schedule") in an electronic form suitable to Owner and Builder for completion of the Work within the allotted time. Owner and Builder each acknowledge that the Project Schedule is a tool to be used to measure Builder's progress and shall be incorporated herein by reference upon completion. Such schedule shall indicate dates for commencement, completion of the Work, and an overall project execution strategy. All points of interface between Owner and Builder (i.e., all instances where performance of Builder's Work depends upon Owner) and appropriate constraints shall be included in the Project Schedule. Builder shall use and be entitled to rely upon information provided by Owner and shall bear no liability for the inaccuracies contained therein or schedule impacts due to incorrect information provided by Owner. The Project Schedule shall take into account the following items of work to be performed by Owner (or its vendors) at the Builder's Shipyard, with Builder providing necessary parts and Materials: (i) installation of winch cables; and (ii) installation of cutterhead unit.

6.5 During the performance of the Work, the Project Schedule shall be kept current to show the progress of the Work, and progress reports shall be resubmitted to Owner for its review prior to submittal of monthly payment milestone invoice. If the progress of the Work in comparison to the Project Schedule evidences that Builder is not substantially on schedule and that completing the Vessel by its Delivery Date is in jeopardy, and Owner so notifies Builder, Builder shall, within fifteen (15) working days thereafter, provide a plan to Owner, which plan must set forth a revised Project Schedule with a resequencing and/or acceleration of elements of the Work in order to complete the Vessel with the least delay possible. Without limiting or waiving any rights to under Article 8, below, if the Project Schedule shows that the actual delivery date of the Vessel will be more than sixty (60) days later than the Delivery Date or, if applicable, any Extended Delivery Date for the Vessel due to causes within the reasonable control of Builder, this shall be an event of default and Owner shall be permitted to terminate the Contract pursuant to the provisions of Article 14.2 below, and Builder shall be entitled to cure such event in accordance with Article 14.2.



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

## ARTICLE 7 – FORCE MAJEURE

7.1 All agreements of the Builder under this Agreement, with respect to any Delivery Date of the Vessel, shall be subject to extension by reason of Force Majeure. Subject to Articles 7.2 through 7.6, the parties agree that such causes shall include, but not be limited to, the following: all strikes, lockouts, or any other industrial disturbance (not within the control of Builder and not involving its own workers), shortages, unavailability or inadequacy of fuel supplies or electricity, supplies, Materials and equipment, acts of God, war, preparation for war, the intervention of the Military or other agencies of government, blockade, sabotage (not involving Builder's own workers or Builder's Subcontractors), terrorism, vandalism (not involving Builder's own workers or Builder's Subcontractors), riots, insurrection, extraordinary rain, landslides, floods, named tropical storms, hurricanes, tornadoes, earthquakes, collisions, fire, epidemics, lightning, delays caused by changes authorized by Owner or by Owner's failure to provide Builder with requested instructions or authorizations in a reasonably timely manner (without prejudice to Builder's entitlement to a Change Order in accordance with Article 9). No such extension, however, shall suspend, alter or affect Builder's right to receive or Owner's duty, if any, to compensate for all Work completed through the date of suspension.

Builder shall notify Owner in writing and shall furnish an estimate of the extent of the delay as soon as reasonably practical but not exceeding thirty (30) days after learning of a Force Majeure event. Builder shall include with that notice (i) a description of the event, (ii) its occurrence date, (iii) its expected duration and (iv) its expected effect on the Project Schedule and the Delivery Date of the Vessel. Builder shall inform Owner in writing of the end of a Force Majeure event as soon as reasonably practical after its cessation but not exceeding thirty (30) days and include an estimate of the delay in any Delivery Date, if any, caused by that event. Upon receipt of Builder's notice of a Force Majeure event, Owner shall, within seven (7) days, either acknowledge the same in writing and indicate agreement if such development is to be treated as a Force Majeure event, or state any objections, and the reasons therefore, to acceptance of this development as a Force Majeure event. Failure to respond shall be deemed to be an acceptance of the Force Majeure event and delays and the Project Schedule shall be extended accordingly. If Owner disagrees, the matter shall be reserved and referred to resolution under Article 25. If and when the completion of the Vessel is delayed by Force Majeure, the Delivery Date of the Vessel shall be adjusted by a period equal to the period specifically and exclusively resulting from the Force Majeure delay.

7.2 Delays caused by weather conditions shall only be Force Majeure where caused by landslide, lightning, flood, windstorm, hurricane, named tropical storm, earthquake, tornado or extraordinary rains which prevent Work from occurring at the Shipyard and occurring outdoors for a full working daytime shift. Rain shall not be considered a Force Majeure event unless (1) its occurrence requires a shutdown of an affected portion of the Shipyard where the Work hereunder is being performed prior to 12:00 noon on a regularly scheduled Working Day, or (2) on the day of such weather conditions, the scheduled Work for that day includes painting and such rain or other weather conditions do not permit painting or any other Work. For each day on which rain meets the requirements set forth in the preceding sentence, Builder shall be entitled to one (1) full day extension of the Vessel's Delivery Date.

7.3 Delays caused by labor shortages and other shortages or inability to perform resulting directly from and that arise immediately following named tropical storms or hurricanes shall only be considered Force Majeure provided that Builder shall have provided to Owner within ten (10) days following its notice of the Force Majeure event a plan by Builder demonstrating that Builder will take all reasonable efforts in order to mitigate the effects and delays arising from such shortages or inabilities to perform in an expedient manner.

7.4 Should there be local area, state or federal government interferences with the Shipyard, this interference will only be considered "Force Majeure" if exercised by the governmental entity pursuant to clear legal authority. If exercised without clear legal authority, it will only be considered "Force Majeure" if Builder reasonably exercises its legal rights to oppose such interference, by all reasonable legal means in order that interference will not cause delays in delivery of the Vessel.

7.5 Delays in receiving supplies, materials and equipment shall not be considered Force Majeure unless (a) caused by the following: all strikes, lockouts, or any other industrial disturbance (not within the reasonable control of Builder and not involving its own workers), shortages, unavailability or inadequacy of



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

fuel supplies or electricity, acts of God, war, preparation for war, the intervention of the Military or other agencies of government, blockade, sabotage (not involving Builder's own workers or Builder's Subcontractors), terrorism, vandalism (not involving Builder's own workers or Builder's Subcontractors), riots, insurrection, landslides, floods, named tropical storms, hurricanes, tornadoes, earthquakes, fire, epidemics, lightning, delays caused by changes authorized by Owner or by Owner's failure to provide Builder with requested instructions or authorizations in a reasonably timely manneror (b) Builder establishes to the reasonable satisfaction of Owner that (1) Builder timely ordered and paid for as required such supplies, materials and equipment; (2) Builder exercised due diligence to obtain delivery; (3) no other source of supply was reasonably available and (4) Builder is unable to reasonably adjust its Project Schedule to maintain scheduled progress of the Work.

7.6 Should Builder claim adjustments to the Delivery Date for the Vessel for ninety (90) or more days in the aggregate for reasons related to Force Majeure events, with the exception of Force Majeure delays caused by sub-contractors that are beyond the control of the Builder, and excluding any other cause of delay attributable to Owner, Owner, in its sole option and discretion, shall have the right to terminate this Contract for convenience by giving seven (7) days prior written notice to Builder of Owner's intent to terminate for convenience under this Article. In such event, Builder shall release the Vessel, and the Work and any Materials or equipment relating thereto to Owner and invoice Owner (a) for the portion of the Contract Price(s) allocable to the Work in progress performed on and Material commitments made for the Vessel as of the effective date of the termination, less the aggregate of previous payments relating to the Vessel and (b) for all documented expenditures made and costs incurred reasonably necessary to the settling or discharging outstanding commitments relating to the Vessel entered into by Builder in performing under this Contract. Owner shall pay the invoice at the time Builder releases the Vessel to the Owner. In the event of termination *for Force Majeure* pursuant to this Article by Owner, Owner's right to terminate shall be its sole and exclusive remedy and the provisions of Article 14 shall not apply and the termination shall not be deemed to be on account of a Builder default. The Parties shall upon termination execute and deliver a mutual release of all obligations under this Agreement relating to the Vessel, except for those that this Agreement provides survive termination. Unless specifically provided in this Agreement, Owner shall not under any circumstances be responsible or liable to Builder, or its Suppliers or Subcontractors of any tier, for any incidental, consequential or special damages or expenses of any type or kind, including, but not limited to, loss of time, loss of profit or earnings, or losses related to detrimental reliance upon the existence of the Contract, whether or not such losses directly or indirectly arise out of the Contract, or from any actions taken by Owner at any time to terminate the Contract.

## ARTICLE 8 – LIQUIDATED DAMAGES FOR DELAY: EARLY COMPLETION BONUS

8.1 In the event Builder shall Deliver the Vessel later than thirty (30) days after the Delivery Date, or Extended Delivery Date for the Vessel, Builder shall pay to Owner as liquidated damages in the form of a reduction in the Contract Price for the Vessel, to the extent any amounts are still owing, and any balance in cash, the amount of Twenty-Five Thousand Dollars ($25,000) per day for each and every day that the actual date of Delivery of the Vessel occurs after the Delivery Date or Extended Delivery Date, as applicable.

8.2 It is agreed that in the event of late Delivery, Owner shall suffer damages which are difficult to ascertain, and the parties acknowledge and agree that liquidated damages in the amounts set forth herein are a reasonable estimate of the anticipated damages that Owner may suffer as a result of delayed delivery and are not a penalty. It is understood and agreed by and between Builder and Owner that such reduction in the Contract Price for the liquidated damages or payment of any balance in cash shall be in lieu of all other delay damages available to Owner under this Agreement or at law or in equity (except for the injunctive relief set forth in Article 6.3), if any, and shall be construed as liquidated damages and as a waiver of any rights or remedies available for the failure to timely complete the Vessel on or before the respective Delivery Date, as adjusted. Such liquidated damages shall be Owner's sole and exclusive remedy for any damages due specifically to late delivery of the Vessel and Owner specifically waives all other rights or remedies at law or in equity (except for injunctive relief) for any such late delivery. Owner specifically reserves its equitable remedies for injunctive relief as contemplated by Article 6.3. Notwithstanding the foregoing, liquidated damages shall cease to accrue at such time that Builder tenders Delivery to the Owner



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

of the Vessel if construction of the Vessel is fully completed in accordance with the Contract Documents, except for minor items which do not adversely affect the ability of the Vessel to be lawfully operated in the service for which it was constructed and which are consented to by Owner, which consent shall not be unreasonably withheld.

8.3 In the event that Builder completes construction and Delivery of the Vessel (including satisfaction of all conditions for Delivery as described herein) in accordance with the Contract Documents *in advance* of the Delivery Date, Owner shall pay to Builder, in addition to the Contract Price, an early completion bonus in the amount of Twenty-Five Thousand Dollars ($25,000) per day (the "Early Completion Bonus") for each and every day that the actual date of Delivery of the Vessel occurs prior to the Delivery Date.

## ARTICLE 9 – CHANGES IN THE WORK

9.1 Owner reserves the right to make any deductions from, or additions to, the Work on giving due notice in writing to Builder, the cost of any such changes to be agreed upon in advance by Owner and Builder, and added to, or deducted from the total Contract Price for the Vessel. If any such change will affect the Delivery Date of the Vessel, or if any delays shall have occurred which, according to the terms of this Agreement require an adjustment of the Delivery Date, the Delivery Date shall be adjusted accordingly. A statement of the increased or reduced amount of the Contract Price (with supporting documentation), and/or any adjustment to the Delivery Date, shall be submitted in Change Order form to Owner by Builder, and must be approved by Owner in writing before any change in the Work is performed by Builder. The Change Order form to be utilized is attached hereto as Exhibit I.

9.2 Changes in the Work or to any Contract Document may be accomplished by Change Order after execution of this Agreement, and without invalidating the Contract, subject to the limitations herein.

9.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and Builder shall proceed promptly on those, unless otherwise provided in the Change Order.

9.4 When Owner and Builder agree on adjustments in the Contract Price or adjustments of the Delivery Date, or Modifications in the Specifications or any Contract Documents or otherwise reach agreement upon the adjustments, such agreement shall be effective only upon execution of an appropriate Change Order, signed only by the authorized signatories identified in Article 21.2.

9.5 Not used.

9.6 Cost of any change considered an addition or a deletion shall be on a labor and materials basis, unless some other method of pricing is agreed by Builder and Owner. Cost of any change considered a substitution shall be the difference between the cost of the new substituted item and the originally specified item.

9.7 Any Work performed on a time and material basis during the Agreement shall be subject to Builder's published rate sheet, attached as Exhibit O. Notwithstanding the foregoing, in no event shall Builder be entitled to a markup for materials in excess of Builder's cost plus twelve and one-half percent (12.5%).

9.8 Each approved Change Order shall be deemed to include all direct and indirect costs, including delay, local disruption, cumulative disruption, cumulative impact, acceleration and like costs associated with, resulting from, or incidental to an approved Change Order including such costs that may be incurred by Builder, its subcontractors and its suppliers.

9.9 No change in the Work under this Agreement, whether by way of alteration or addition to or deletion of the Work, shall be the basis of a change to the Contract Price or a change in a relevant Delivery Date unless and until such alteration or addition or deletion has been authorized by a Change Order executed and issued in accordance with and in strict compliance with the requirements of the Contract Documents. In no event shall Builder be obligated to perform any changes to the Work upon verbal or written direction of Owner which is not in conformity with the requirements of this Agreement.



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

## ARTICLE 10 – INSURANCE

10.1 At any and all times during the term of this Agreement, Builder shall at its own expense maintain, with an insurance company or companies authorized to do business in the state in which Work is to be performed and reasonably acceptable to Owner, insurance coverages of the kind and in the minimum amounts as follows:

1.1.1. Workmen's Compensation Insurance including occupational disease and coverage under the United States Longshoremen's and Harbor Worker's Compensation Act, such insurance to cover all benefits provided by the applicable Act, also Employer's Liability Insurance extended to include coverage for Maritime Employer's Liability (i.e., Jones Act, Death on the High Seas Act and transportation, wages, maintenance and cure) with minimum limits of $1,000,000 in any one occurrence. Owner agrees that Builder's statutorily approved self--insured status issued by the U. S. Department of Labor for such liability is acceptable in lieu of commercial insurance.

1.1.2. Comprehensive General Liability Insurance with an endorsement specifically covering the liability assumed by the Builder under this Contract or evidence of blanket contractual liability that specifically addresses the exposures of this Contract, sudden & accidental seepage & pollution coverage, watercraft exclusion deleted or modified to address the exposures of this Contract, and "in rem" endorsement with minimum limits of $1,000,000 per occurrence.

1.1.3. Professional Liability Insurance. Any third-party Engineering Firm engaged by Builder to perform design and engineering in connection with the Vessel, shall provide Professional Liability insurance with minimum limits of $2,000,000.

1.1.4. Builder's Risk Insurance naming Owner as a named insured and loss payee, as its interests may appear, covering the Vessel, the Work and Materials for its full insurable value against all risks, including but not limited to fire, while under construction and/or fitting out and/or on Dock Trials or Sea Trials, including Materials in buildings, workshops, yards and docks of the Builder, or on quays, pontoons, craft, etc., and against all risks while in transit to and from the Shipyard and/or the Vessel, wherever she may be lying, also all risks of loss or damage through collapse of supports or ways from any cause whatever, and all liability risks of Builder and Owner with respect to construction and delivery of the Vessel. Such policy shall provide coverage for any Owner Furnished Items while at the Shipyard and during transit to/from the Shipyard as declared, valued and identified by Owner to Builder. Such insurance will be in the amount of the full insurable value of the Vessel, Work and Materials. Any provisions of the Builder's Risk Insurance liability coverages that would limit liability coverage for any assured to liabilities "as owner," or words of similar effect, or that would exclude liabilities for injury or death of "employees" of an assured, while part of the Vessel's crew for purposes of Dock Trials or Sea Trials, must be deleted or appropriately modified by endorsement to the policy.

1.1.5. Hull & Machinery, Protection & Indemnity (P&I) and Pollution for any owned and/or bareboat chartered vessels used in conjunction with Builder's operations:

1.1.1.1. Hull & Machinery per American Institute Hull Clauses (amended for the vessel operations at the shipyard) or equivalent to the fair market value of the vessel. Any references to "other than owner" or other owner limitations will be deleted by endorsement to the policy as respects the naming of Owner as an additional assured;

1.1.1.2. P&I per P&I form SP 23 or equivalent (amended for the vessel operations at the shipyard) with a minimum limit of $1,000,000 per occurrence. Any references to "other than owner" or other owner limitations will be deleted by endorsement to the policy as respects the naming of Owner as an additional assured;

1.1.1.3. Pollution per Water Quality Insurance Syndicate (WQIS) or equivalent with a minimum limit of $5,000,000.



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

1.1.6. Pollution Coverage for Vessels under Repair, Construction or Modification per WQIS policy wording, inclusive of Builder's responsibility for pollution liability and/or Certificate of Financial Responsibility (COFR) with a minimum limit of $5,000,000.

1.1.7. Bumbershoot or Excess Liabilities providing excess liability coverage above the primary liability coverages noted above with a minimum limit of $5,000,000. To the extent limits above this $5,000,000 minimum limit are purchased by Builder, such additional limits shall also cover Owner as an additional insured with the same provisions as noted for the $5,000,000 minimum limit.

10.2 Prior to Work, Builder shall procure, from each of its insurers, in respect of risks assumed under this Contract, a written and enforceable specific endorsement of Builder's policies (excluding worker's compensation, which is noted below) to provide a blanket and unrestricted waiver of the underwriter's or insurers' rights of subrogation against the Owner and shall be endorsed to name the Owner's Group, as defined in Article 23, and their successors and assigns as additional insured. Builder agrees that its policies shall be primary in all cases, except cases in which liabilities result directly from the acts or omissions of Owner's Representatives or Owner's separate contractors. Any insurance that may be carried by Owner shall be excess over and above the amount recoverable under the policies of Builder, except cases in which liabilities result directly from the acts or omissions of Owner's Representatives or Owner's separate contactors. The policies of insurance procured by Builder shall acknowledge that said policies are primary, and that no pro--rata contributions are required by the Owner or Owner's insurers, except cases in which liabilities result directly from the acts or omissions of Owner's Representatives or Owner's separate contactors. Builder further agrees that its worker's compensation insurance policies shall be endorsed to designate Owner Group, as defined in Article 23, and their successors and assigns, as an alternate and statutory employer and shall be endorsed to provide a blanket and unrestricted waiver of its underwriters' or insurers' rights of subrogation.

10.3 Certificates of Insurance. Before commencing Work, Builder shall furnish Owner with Certificates of Insurance indicating (1) kinds and amounts of Insurance as required, (2) the names of the insurance company or companies providing the aforesaid coverages, (3) the effective and expiration dates of policies, (4) that Owner will be given thirty (30) days written advance notice of any cancellation or material change in any policy, or in the event of non-- payment of premiums, five (5) days written advance notice, (5) waiver of subrogation endorsement has been attached to all policies, (6) that all of Owner's Group have been named as additional insureds by endorsements attached to all policies, provided that Owner shall be named as a named insured under the Builder's Risk insurance policy and (7) the territorial limits of all policies. All deductibles will be for the account of Builder.

## ARTICLE 11 – WARRANTY

11.1 Builder shall designate at least sixty (60) days prior to Delivery, a Warranty Manager for the Vessel. The Warranty Manager shall be familiar with the Work and all Builder's Suppliers vendors and/or Subcontractors. The Warranty Manager shall work with Owner's Representative in i) understanding the nature of any warranty claim, ii) coordinating with Builder or Builder's Supplier or Subcontractor a remedy, and iii) assisting in coordinating payments on any third-party vendor or subcontractor work. Within a reasonable time of becoming aware of a warranty claim, the Owner shall issue a Warranty Notification to the Builder in the form of Exhibit J. Upon receipt of a Warranty Notification, the Warranty Manager will take all reasonable steps, as outlined above, to resolve the claim.

11.2 Builder warrants that the Work and the Vessel shall be constructed in accordance with the Contract Documents and shall be free from defects in workmanship and materials for a period of three hundred sixty--five (365) days after the Delivery of the Vessel. Builder will replace or repair any defects in its Work that are discovered within such three hundred sixty-five (365) period, provided Owner has complied with its written notice obligations. Subject to Article 11.4, this warranty, shall extend to likewise warrant such replaced or repaired Work for an additional three hundred sixty-five (365) day period, provided that the Vessel is brought to the Shipyard for such replacement or repair. Where, because of the geographical distances involved, it would be impractical to return the Vessel to the Shipyard for repairs or replacements under this warranty, Owner may, after giving reasonable notice to Builder in order to allow Builder, at its



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

option, to inspect such alleged defect(s) and make the necessary repairs or replacement, and if Builder cannot make such repairs on-site in an expedient manner, effect the necessary repairs at other available facilities, and Builder will reimburse Owner for those costs, provided that the amount of reimbursement of costs of making the repairs do not exceed costs calculated on the time and material rates as set forth Article 9.7 and Exhibit O. Nothing contained herein shall obligate Builder at any time to repair or replace the Vessel, or any Work or component part thereof, where and to the extent such repair and/or replacement is caused by ordinary wear and tear or the negligent operation or maintenance of the Vessel, or its equipment, by Owner or third parties.

11.3 Builder shall use its best efforts to effect warranty repairs without necessitating that the Vessel be removed or prevented from commercial service to the benefit of Owner.

11.4 Builder shall advise Owner of, and deliver the original documentation for, all manufacturer's warranties applicable to equipment and Materials furnished by the Builder and Builder shall arrange for warranties to commence in favor of Owner on the date of Delivery of the Vessel. Builder shall and does hereby assign, convey and transfer over to Owner all Warranties issued by any third party for any equipment or Materials purchased by Builder and installed on the Vessel. Builder shall provide Owner with all standard commercially available operating and maintenance manuals with respect to all equipment installed in the Vessel in accordance with the quantities set forth in the Specifications.

11.5 If within three hundred sixty-five (365) days after Delivery of the Vessel, any of the Work performed by Builder or its Subcontractors is found to be defective, other than defects related to equipment and/or Materials for which a manufacturer's warranty has been transferred to Owner in accordance with Article 11.4 above, or is found to be not in accordance with the requirements of the Contract Documents, the Builder shall correct it promptly after receipt of written notice from the Owner to do so in accordance with Article 11.1. It shall be the duty and obligation of Owner to promptly give Builder written notice after discovery thereof of the failure of any part of the Work as a result of defective workmanship or defective materials, giving full information as supported by photographs, where possible.

11.6 Builder warrants that it will utilize high-quality paint and coatings and that it will prepare the surface and apply the paint in accordance with the manufacturer's specifications and recommendations, and Builder makes no warranty, express or implied, with respect to the fitness of the specified paint or the manufacturer's specifications and recommendations. Builder will require the paint and/or coatings manufacturer's field representative to be present at the time Builder is applying paint and/or coatings and shall obtain the representative's approval for the paint and/or coating systems to be applied and the preparation and procedures being followed by Builder. Owner shall be provided with a copy of all inspection reports provided to Builder by the representative. Builder shall provide reasonable assistance to Owner to obtain paint warranties from the paint manufacturers, and any warranty defects with respect to the paint or coatings systems shall be asserted by Owner only against such manufacturer.

11.7 For all claims arising outside of the Warranty Period (and any extension of the Warranty Period), Owner hereby waives and releases Builder and its employees from and against damage to and/or loss of the Vessel, delay, demurrage, loss of profits, loss of use, or any other consequential or punitive damages of any kind, whether such claim is based in contract, redhibition (including redhibition and reduction of purchase price pursuant to Louisiana Civil Code articles 2520 et seq. and aredhibitory or latent defects or vices under Louisiana Civil Code articles 2520 through 2548), negligence, strict liability, or otherwise, arising out of any defect and/or negligent design, the selection or choice of specifications and/or materials and/or component parts, manufacture, construction, fabrication, workmanship, labor and/or installation of equipment, materials and/or components or from any unseaworthy condition or any other defective condition of the Vessel, it being specifically understood and agreed that any such defects reported and/or occurring after the Warranty Period (and any extension of the Warranty Period) and all damages to the Vessels, loss of profits, demurrages, delay, losses of use or other consequential or punitive damage of any kind whatsoever resulting therefrom, shall not be the responsibility of Builder.

**11.8 THE WARRANTY EXPRESSLY PROVIDED IN ARTICLE 11 IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED BY LAW OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR THAT THE VESSEL'S MATERIALS OR SERVICES ARE FIT FOR ANY PARTICULAR PURPOSE OR USE, AND THE REMEDIES PROVIDED HEREUNDER ARE OWNER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY AND ARE**



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**SPECIFICALLY IN LIEU OF ALL OTHER REMEDIES OR DAMAGES, WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL.**

## ARTICLE 12 – FINANCIAL SECURITY

Upon request of Owner, and in order to secure Builder's obligations under this Agreement, including the timely and proper performance of the Work hereunder as stipulated in the Contract Documents within twenty-one (21) Days of Builder's execution of this Agreement, Builder shall deliver to Owner a standby letter of credit ("SLOC") or other evidence of surety issued by a banking institution satisfactory to Owner, in the minimum amount of $5,000,000, provided that Owner shall bear all reasonable and customary costs associated with such SLOC or other evidence of surety, including, but not limited to banking fees and expenses, if any.

## ARTICLE 13 – ELIMINATION OF INCIDENTAL AND CONSEQUENTIAL DAMAGES

IT IS UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT, EXCEPT AS OTHERWISE CONTEMPLATED BY ARTICLE 8 OF THIS AGREEMENT, NEITHER PARTY SHALL IN ANY WAY BE LIABLE OR RESPONSIBLE TO THE OTHER FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS AND LOSS OF USE OF THE VESSEL OR THE SHIPYARD FROM ANY CAUSE OF ACTION OF ANY KIND OR NATURE (COLLECTIVELY "CONSEQUENTIAL DAMAGES"), INCLUDING BUT NOT LIMITED TO NEGLIGENCE (IN WHOLE OR IN PART BUT EXCLUDING ANY THIRD PARTY PERSONAL INJURY OR PROPERTY DAMAGE LIABILITY), STRICT LIABILITY, FAULT, CONTRACT, WARRANTY OR ANY OTHER CAUSES OF ACTIONS, ARISING OUT OF OR IN CONNECTION WITH OR PERTAINING TO THIS AGREEMENT OR THE VESSEL CONSTRUCTED HEREUNDER. THE ELIMINATION OF INCIDENTAL AND CONSEQUENTIAL DAMAGES AS PROVIDED HEREIN IS AN ESSENTIAL CONDITION OF THIS AGREEMENT AND EACH PARTY ACKNOWLEDGES THAT THE OTHER WOULD NOT HAVE ENTERED INTO THIS AGREEMENT WITHOUT SAID ELIMINATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR THE CONSIDERATION SET FORTH HEREIN FOR THE CONSTRUCTION OF THE VESSEL.

## ARTICLE 14 – DEFAULT AND TERMINATION

14.1 The following events shall constitute events of default by Builder:

14.1.1 There is filed by or against Builder in any court a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Builder's property, or an order of discharge of Builder is ordered by any Court;

14.1.2 Owner's materials, supplies, and equipment identified with the Vessel are removed from the Shipyard without Owner's consent or applied to a vessel not owned by the Owner;

14.1.3 Builder makes an assignment for the benefit of creditors or petitions for or enters into an agreement or agreements with its creditors, and by reason of any of these events Builder's obligations under the Contract are assigned to or are to be or are performed by a person other than Builder;

14.1.4 Builder materially fails to execute or perform the Work in accordance with this Agreement;

14.1.5 Builder materially fails to cause the removal or bonding of any liens or privileges, except those created by Owner or Owner's subcontractors or vendors, filed or otherwise existing against the Work or the Vessel;

14.1.6 Builder materially disregards applicable laws, ordinances, rules, regulations or orders of any public authority having jurisdiction over the Work on the Vessel;

14.1.7 Delay in the construction or Delivery of the Vessel that would permit Owner to terminate the Agreement as set forth herein; or



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

14.1.8 Builder, without limitation, fails to perform any other material obligation of Builder under this Agreement.

14.2 If an event of default set forth in Article 14.1 occurs, then Owner, by giving written notice of any such event to Builder, in addition to and without prejudice to any other remedies it may have under this Agreement, may terminate the Agreement in writing, transport, at Builder's expense, the Work in progress, and complete such Work by such means as Owner deems fit, subject to Owner's duties to use its best efforts to mitigate costs of such completion. However, (except where termination occurs pursuant to Article 7.6 or as a result of the events described in Articles 14.1.1 or 14.1.3) no termination shall be effective if Builder cures the noticed event of default within thirty (30) Days after receipt of Owner's written notice.

14.3 Upon Owner's termination of the Agreement becoming effective pursuant to this Article, Builder will promptly undertake, at its sole cost, to place all Work pertaining to the Vessel in a suitable condition for transportation to another location. Builder will provide Owner access to such Work and provide reasonable assistance to Owner in the removal from the yard of any Work completed to the date when the Work was discontinued, and shall allow Owner and Owner's representative continuing access to the Shipyard and storage areas for a period of thirty (30) Days following the expiration of the cure period in order to remove the Work and any related Materials that have been paid for by Owner to another location. Owner shall be liable to pay to Builder for those parts of the Work incorporated into, supplied or delivered to the Vessel by the Builder less the amount of the Contract Price previously paid by the Owner.

14.4 If Owner terminates the Agreement, in whole or in part, in accordance with terms of this Agreement, Owner may thereafter call upon the issuing bank and invoke all rights and remedies available to it pursuant to the SLOC that is to be provided by Builder pursuant to Article 12 of this Agreement.

14.5 In the event of any termination by Owner, Owner may require Builder promptly to assign and/or deliver to Owner all or any (a) bids or proposals, (b) subcontracts, (c) construction plans, (d) Materials, tools and equipment (to the extent paid for by Owner), (e) rental agreements, (f) Work, including the Vessel (to the extent Owner has title to same in accordance with Article 22.1), and (g) any other commitments directly related to the Vessel which Owner, in its sole discretion, chooses to take by assignment, and in the case of assignments hereunder, Builder shall promptly execute and deliver to Owner written assignments of same. This provision shall survive the termination of the Agreement.

14.6 The following events shall constitute events of default by Owner:

14.6.1 Owner shall fail to make any payment when required under this Agreement and, subject to any disputed amounts, such payment is not made within fifteen (15) Working Days after Owner's receipt of written notice of the failure of payment from Builder to Owner;

14.6.2 There is filed by or against Owner in any court a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Owner's property, and an order of discharge of Owner is ordered by said Court;

14.6.3 Owner makes an assignment for the benefit of creditors or petitions for or enters into an agreement or agreements with its creditors, and by reason of any of these events Owner's obligations under the Contract are assigned to or are to be or are performed by a person other than Owner; or

14.6.4 Owner, without limitation, fails to perform any other material payment obligation of Owner under this Agreement.

14.7 If Owner fails to timely cure a payment default in accordance with Article 14.6.1, then Builder may, in its sole discretion, suspend or reschedule progress of the Work (such right being in addition to any other right granted hereunder or by operation of law) until such time as it receives the overdue payment from Owner. Furthermore, whether or not Builder has suspended or rescheduled progress of the work as aforesaid, if an event of default set forth in Article 14.6 occurs, Builder may elect to terminate this Agreement after giving thirty (30) Days written notice to Owner of its intent to terminate. However, during the thirty (30) Day period referred to above, Owner shall have the absolute right to cure any such default. If such default is not timely cured, Builder may, at its option, terminate the Agreement in whole or in part, and either i) demand performance from Owner, or seek resolution of the payment default through the procedure set forth in Article 25, (ii) sell the Vessel in its then present condition and location at a public auction announced



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

at least twenty (20) days in advance in a local newspaper in the Greater New Orleans area; provided written notice of the auction has been provided to Owner, or (iii) complete the Vessel for sale to a third party and apply the proceeds of sale, net of all expenses, to any unpaid balance due and owing to Builder. The excess proceeds from any such auction or sale shall be paid to Owner.

14.8 Delay by Owner or its representatives in providing to Builder or its agents any Owner-supplied information, documents and/or goods or materials for the construction of the Vessel shall not constitute a breach or default of this Agreement by Owner but shall be covered instead by the appropriate provisions of Article 7 relating to Force Majeure.

14.9 The failure of either party to exercise any rights conferred upon it under any provision of this Agreement with respect to any breach or default by the other party shall constitute neither a waiver of its rights under any other provision of this Agreement with respect to such breach or default, nor a waiver of its rights under the same or any other provision of this Agreement with respect to any other breach or default.

## ARTICLE 15 – APPLICABLE LAW

This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the laws of the State of Louisiana, without regard to conflicts of law principles.

## ARTICLE 16 – CONTRACT

16.1 The Contract Documents consist of this Agreement (including all Exhibits), the Specifications listed in Exhibit B, the Contract Drawings listed in Exhibit C, and all written Modifications issued after execution of this Agreement and represent the entire agreement between Owner and Builder. The Contract Documents form the Contract, and all are as fully a part of the Contract as if attached to this Agreement or repeated herein. The invalidity or unenforceability of any phrase, sentence, clause or section in this Contract shall not affect the validity or enforceability of the remaining portions of this Contract, or any part thereof. The Contract may be amended or modified only by a written Modification.

16.2 The intent of the parties as enumerated in the Contract Documents is for Builder to build the Vessel in accordance with the Contract Documents for the Contract Prices and by the Delivery Date. If there are any conflicts or inconsistencies among the terms of this Agreement and the Specifications, the terms of this Agreement shall take precedence over the Specifications. If there are any conflicts or inconsistencies among the terms of the Specifications and Drawings, the terms of the Specifications shall take precedence over the Drawings.

16.3 Unless expressly stipulated to the contrary in this Agreement, Builder shall provide and pay for all services, labor, overtime labor, standby labor, methods, Materials, equipment, transportation, taxes, tariffs, import duties and clearances, permits and fees and all other facilities and services necessary to complete the Vessel for the Contract Price within the Delivery Date. Notwithstanding the foregoing, to the extent applicable and not exempted, Owner will pay sales and use taxes due on materials, labor and equipment incorporated into the Work or incurred in connection with the sale or delivery of the Vessel.

16.4 Inconsistencies between other Contract Documents and this Agreement shall be governed by this Agreement. All general language or requirements contained in the Specifications and all other requirements inconsistent or in conflict with the provisions of this Agreement are superseded by this Agreement, it being the intent of the parties that the provisions of this Agreement shall prevail. If there is any conflict or inconsistency between the Specifications and the other Contract Documents (other than this Agreement), the Specifications shall prevail.

## ARTICLE 17 – INSPECTION, ACCESS, TESTS AND OFFICIAL CERTIFICATES

17.1 During construction, Builder shall provide Owner facilities and access to inspect the Vessel,



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

material, workmanship, plans, tests and movements. Builder shall provide a suitable office for Owner's personnel and Builder shall provide access to suitable facilities for same and conditions such as a meeting table, drawing table and chairs, desks, locking file cabinets, private telephone with voice messaging, private fax/scanner, printer, computer modem, extra phone line, copy machine, secure LAN or Wi-Fi internet connection, heat and air conditioning. Builder may deny access to Owner and any representative, agent, employee of Owner or its other contractors if in Builder's sole discretion such persons do not comply with Builder's health, safety and environmental policies or special security requirements.

17.2 All of the workmanship and material required under this Agreement, while the same is in the process of fabrication, erection, construction, installation and performance, shall be inspected promptly by Owner and shall be accepted promptly in accordance with the Contract Documents or rejected promptly in accordance therewith. Failure to object will not prevent Owner from later identifying defects or rejecting workmanship if Owner has used reasonable diligence to discover defects promptly, subject to the terms of the Warranty under Article 11.

17.3 Owner shall appoint an "Owner's Representative" and Owner shall inform Builder in writing as to the extent of authority Owner has granted to said Owner's Representative.

17.4 Tests and Inspections:

17.4.1 Tests, inspections and approvals of portions of the Work required by the Contract Documents or by applicable laws, ordinances, rules, regulations or orders of Regulatory Authorities shall be made at an appropriate time. Unless otherwise provided, Builder shall make arrangements for such tests, inspections and approvals and shall bear all related costs of tests, inspections and approvals of the Work. Builder shall give Owner at least seventy-two (72) hours' notice of when and where tests and inspections are to be made so Owner may observe such procedures.

17.4.2 If Owner determines that portions of the Work require additional testing, inspection or approval not included under Article 17.4.1, Owner will instruct Builder to make arrangements for such additional testing, inspection or approval by an entity acceptable to Owner, and Builder shall give at least forty-eight (48) hours' notice to Owner of when and where tests and inspections are to be made so Owner may observe such procedures. Owner shall bear the cost of such tests. If any testing or inspection conducted by Builder as provided in this Article 17.4.2 affirms that Builder's workmanship is acceptable under the Contract Documents, Builder shall receive an adjustment of the Delivery Date, at Builder's option, for the time it took to conduct such tests and inspections.

17.4.3 If any testing or inspection conducted by Builder as provided in Article 17.4.2 discloses that any methods or means of construction or material or workmanship are not acceptable under the Contract Documents, Builder shall reimburse the Owner for the costs of such tests and inspections, including the cost of related labor and facilities and shall remedy the Work so as to comply with the Contract Documents.

17.4.4 Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be obtained by Builder and promptly delivered to the Owner.

17.4.5 If Owner is to observe tests, inspections or approvals required by the Contract Documents, Owner will do so promptly and at the normal place of testing.

17.4.6 Neither the observations of Owner nor inspections, tests, or approvals by persons other than Builder shall relieve Builder from its obligations to perform the Work in accordance with the Contract Documents.

## ARTICLE 18 – ASSIGNMENT OF THE AGREEMENT

This Agreement shall inure to the benefit of Builder and Owner and their successors and assigns



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

and shall be binding upon Builder and Owner and their successors and assigns; provided, that Builder shall not assign this Agreement or any interest hereunder without the prior written consent of Owner, which shall not be unreasonably withheld and any assignment without said prior written consent shall be null and void. If Builder assigns its rights under this Agreement, Builder shall at all times remain jointly and severally liable under this Agreement. Owner may at any time, sell the Vessel and/or assign this Agreement, or its rights hereunder but Owner shall at all times remain jointly and severally liable under the Agreement. Builder agrees that such a sale and/or assignment shall not be grounds for termination of this Agreement.

## ARTICLE 19 – COMPLIANCE WITH REGULATIONS

Builder shall comply with laws, rules, regulations and requirements of any Regulatory Authorities that are applicable and existing at the time of the execution of this Agreement that are in effect or which shall become effective as to the Vessel during the Project Schedule and which affect the construction of works, plants and vessels, in or on navigable waters and the shores thereof, and all other waters subject to the control of the United States as set forth in the Contract Documents and shall procure at its own expense such permits from the United States and from state and local authorities in the jurisdiction in which Builder is constructing the Vessel as may be necessary in connection with beginning or carrying on the completion of the Work, and shall at times comply with all United States, state and local laws in the jurisdiction in which Builder is constructing the Vessel in any way affecting the Work and affecting any documentation of such work with the U.S. Coast Guard. Any changes in laws or regulations that have not previously been incorporated in the Contract Documents and that affect either the Work or Delivery Date or Contract Price will be subject of a Change of Order to the Contract.

## ARTICLE 20 – INTELLECTUAL PROPERTY

20.1 Except to the extent that the Design is modified by Builder as contemplated hereunder, Owner agrees to defend, at its own expense, any claim or action brought by any third party against Builder and/or any of the Builder Group, as defined in Article 23.2, for actual or alleged infringement (including contributory or vicarious infringement) of any patent, copyright, trademark or other intellectual property right (including, but not limited to, misappropriation of trade secrets) based upon the design materials, processes, machinery and equipment supplied by Owner and/or its subcontractors and embodied in the Design or in the Work. Owner further agrees to indemnify and hold harmless Builder and the Builder Group from and against any and all liabilities, losses, costs, damages, and expenses (including reasonable attorneys' fees) associated with any such claim or action incurred by Builder and/or the Builder Group. Owner shall have the right to conduct and control the defense of any such claim or action and all negotiations for its settlement or compromise, unless otherwise mutually agreed to in writing between the parties hereto. Builder agrees to give Owner prompt written notice of any written threat, warning or notice of any such claim or action. If in any such suit so defended, all or any part of the Builder's Work (or any Design element, component, equipment or material thereof that is supplied by Owner) is held to constitute an infringement or violation of any third party's intellectual property rights and is enjoined, or if in respect of any claim of infringement, Owner deems it advisable to do so, Owner shall, after consultation with Builder, take one or more of the following actions at no additional cost to Builder: (a) procure the right to continue the use of the same without material interruption for Builder or (b) take back the infringing material and restore it with non-infringing material acceptable to Builder at no additional cost to Builder.

20.2 Owner represents and warrants that it owns, and will maintain during this Agreement, sole and unencumbered ownership of the Design, the Specifications and any other construction documentation prepared in connection with the Work including all Intellectual Property rights necessary to perform the Work contemplated herein. This warranty shall survive the termination of this Agreement.

## ARTICLE 21 – NOTICES AND COMMUNICATIONS



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

21.1 Notices required hereunder shall be sent in accordance with the following and at the addresses hereinafter set forth. Any notice or communication required or permitted to be given hereunder shall be given in writing, shall be effective only if given in one of the following manners, and shall be deemed given and deemed received: (a) if mailed by United States Registered or Certified Mail, postage prepaid, return receipt requested, on the third day after the notice is deposited in an official United States mail receptacle with postage prepaid; (b) if given by facsimile transmission, on the date transmitted provided that (1) receipt is confirmed, and (2) an additional copy of the notice or communication is sent on the same day by nationally utilized overnight courier; (c) if given by nationally utilized overnight courier, on the first business day after it is sent; (d) if hand delivered, on the date a receipt is obtained from the person to whom same is delivered. Notices hereunder shall be addressed as follows:

If to Owner:

Callan Marine Ltd.

P.O. Box 17017 Galveston, Texas 77552

Attention: Maxie J. McGuire Jr., President

Tel. 409.762.0124

Email: mmcguire@callanmarineltd.com

With a copy to:

Scott A. Mixon, General Counsel

Callan Marine Ltd. P.O. Box 17017 Galveston, Texas 77552

Tel. 409.502.7546

Email: smixon@sullbros.com

If to Builder:

C&C MARINE AND REPAIR LLC

______________________

Attention: ______________

Tel. ______________

Email: ______________

With a copy to:

______________________

______________________

Attention: ______________

Tel. ______________

Email: ______________

21.2 Notwithstanding any other provision of this Agreement, all final authorizations and agreements concerning deductions from, additions to, or modifications of the Vessel design or Specifications or any agreements that concern changes in the stipulated Delivery Date and/or Contract Price shall not be valid



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

or binding on either party unless signed by one of the below designated representatives for each party or their respective successors in office:

OWNER: Maxie J. McGuire, its President
Arie van den Adel, its Chief Operating Officer

BUILDER: ______, its ________________

Each party agrees that at least one of its designated representatives will be available for consultation during normal working hours. It is further agreed that each party may change one or more of the above--designated representatives upon ten (10) days prior written notice in accordance herewith.

## ARTICLE 22 – TITLE AND SECURITY

22.1 Title in and to the Vessel as it is constructed shall progressively vest and, once vested shall in all events remain in the Owner, not the Builder, in the proportions and to the extent of the timely payments made by Owner under the provisions of this Agreement. Title to all Materials and equipment or other items furnished by Builder shall vest in Owner upon the payment by Owner of the Monthly Payments, if any, covering the subject Materials and equipment. Without regard to the provisions of this Article 22.1 and notwithstanding legal title vesting in Owner as described above, Builder shall have full care, custody and control of the Vessel and its Materials, and shall be subject to the risk of loss of the Vessel and its Materials and the Work until the completed Vessel is delivered to and accepted by the Owner as provided in this Agreement. Owner's title to the Vessel, the Materials and the Work is subject to a possessory lien in favor of Builder to the extent, if any, that Builder has not been paid.

22.2 If, notwithstanding the express provision of Article 22.1 or otherwise of this Agreement, the Vessel or any of the property to which Owner holds title as described in this Article, is for any reason deemed by any court of competent jurisdiction not to be the property of, and owned by Owner, Builder, to the extent it has any interest therein, alternatively hereby grants a first priority security interest in such Vessel and all of such property in favor of Owner. The security interest granted hereby in the alternative shall secure all of Builder's obligations to Owner under this Agreement. Owner shall have the right to file without any further consent or signature of Builder one or more UCC-1 Financing Statements against Builder covering the Vessel and any or all of such other property pertaining to the Vessel. In such Financing Statement(s), Owner shall be entitled to give notice of its ownership of the Vessel and such other property pertaining to the Vessel, and in the alternative, its security interest therein.

22.3 Immediately upon any property described in this Article becoming or being deemed the property of Owner under the provisions of this Article, Builder shall conspicuously mark or cause to be marked on the bow of the Vessel, and also on all such other property or its packaging, the Builder's Hull Number for the Vessel, and without prejudice to Owner's rights hereunder, Builder shall take all necessary steps to cause all such property to be numbered and marked as aforesaid by itself or by its Suppliers and Subcontractors with all reasonable expedition.

22.4 Builder shall use it best efforts to arrange its contractual arrangements with all of its Subcontractors and Suppliers such that full effect will be given to the title provisions of this Article and without limiting the foregoing, shall ensure that all property shall be supplied on the following conditions:

1.1.1. that the title to such property supplied by a Subcontractor or Supplier (whether in the course of construction or completed and whether before or after delivery to Builder) shall vest immediately in Builder (and thence, pursuant to Article 22.1, immediately in Owner), subject only to the Subcontractor's or Supplier's possessory lien, if any, for any unpaid balance of the purchase price of such property; and

1.1.2. that the Subcontractor or Supplier shall not, upon receipt by it of the purchase price for such property, be entitled, as against Owner, to claim any title or lien therein by reason of obligations or liabilities of Builder to the Subcontractor of Supplier in respect of any other



E-Filed

EXHIBIT 1

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

deliveries made by the Subcontractor or Supplier to the Builder, or for any other reason.

22.5 In addition to any other rights that may exist at common law or by statute or under this Agreement, Builder shall be entitled to a possessory lien on the undelivered Vessel and on any Material furnished by Builder relating to the Vessel for any unpaid portion of the Contract Price for the Vessel that is then actually due and payable.

## ARTICLE 23 – INDEMNIFICATION

23.1 BUILDER SHALL UNCONDITIONALLY RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER, ITS PARENT, OFFICERS, AGENTS, EMPLOYEES, SUBSIDIARIES, AFFILIATES, SUCCESSORS, ASSIGNS AND THE VESSEL ITSELF (HEREINAFTER COLLECTIVELY REFERRED TO AS THE "OWNER GROUP") FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, DEMANDS, LOSSES, SUITS, AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER AND THE COSTS THEREOF (INCLUDING, WITHOUT LIMITATION, COURT COSTS, ANY OTHER LITIGATION EXPENSES, AND ATTORNEYS' FEES INCLUDING ANY SUCH COSTS, EXPENSES AND FEES INCURRED IN SUING TO ENFORCE THIS ARTICLE 23.1), ARISING OUT OF OR RELATED TO ANY INJURY, DEATH OR PROPERTY DAMAGE (INCLUDING, BUT NOT LIMITED TO, CLAIMS, DEMANDS, OR SUITS FOR BODILY INJURIES, EMOTIONAL AND PSYCHOLOGICAL INJURIES, ILLNESSES, DISEASES, LOSS OF SERVICES, LOSS OF SOCIETY, DIMINISHED EARNINGS CAPACITY, MAINTENANCE AND CURE, WAGES, OR WORKER' S COMPENSATION) OCCURRING IN CONNECTION WITH THE PERFORMANCE OR NON– PERFORMANCE OF THIS AGREEMENT TO THE EXTENT ALLEGED OR ASSERTED BY BUILDER, OR BY ANY OF BUILDER'S SUBCONTRACTORS, OR BY ANY EMPLOYEE, AGENT OR INVITEE OF BUILDER OR BY ANY EMPLOYEE, AGENT OR INVITEE OF BUILDER'S SUBCONTRACTORS, OR BY ANY THIRD PARTY. THE RELEASE, DEFENSE, AND INDEMNIFICATION OBLIGATIONS OF BUILDER PROVIDED IN THE PRECEDING SENTENCE SHALL APPLY, IN EACH CASE, TO THE EXTENT THAT SUCH CLAIM, DEMAND, LOSS, SUIT OR CAUSE OF ACTION IS ALLEGED TO BE CAUSED BY THE NEGLIGENCE, ACT, OMISSION, FAULT OR STRICT LIABILITY OF ANY MEMBER OF BUILDER GROUP OR AS A RESULT OF CLAIMS OF UNSEAWORTHINESS OF ANY VESSEL, DEFECT IN PREMISES, OR ANY OTHER ACT OR OMISSION BY ANY MEMBER OF BUILDER GROUP, AND REGARDLESS OF WHETHER SUCH NEGLIGENCE, ACT, OR OMISSION IS ACTIVE OR PASSIVE, PRIMARY OR SECONDARY.

23.2 OWNER SHALL UNCONDITIONALLY RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS BUILDER, ITS PARENT, OFFICERS, AGENTS, EMPLOYEES, SUBSIDIARIES, SUBCONTRACTORS, AFFILIATES, SUCCESSORS, ASSIGNS AND VESSELS (HEREINAFTER AND BEFORE COLLECTIVELY REFERRED TO AS THE "BUILDER GROUP") FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, DEMANDS, LOSSES, SUITS, AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER AND THE COSTS THEREOF (INCLUDING, WITHOUT LIMITATION, COURT COSTS, ANY OTHER LITIGATION EXPENSES, AND ATTORNEYS' FEES INCLUDING ANY SUCH COSTS, EXPENSES AND FEES INCURRED IN SUING TO ENFORCE THIS ARTICLE 23.2), ARISING OUT OF OR RELATED TO ANY INJURY, DEATH OR PROPERTY DAMAGE (INCLUDING, BUT NOT LIMITED TO, CLAIMS, DEMANDS, OR SUITS FOR BODILY INJURIES, EMOTIONAL AND PSYCHOLOGICAL INJURIES, ILLNESSES, DISEASES, LOSS OF SERVICES, LOSS OF SOCIETY, DIMINISHED EARNINGS CAPACITY, MAINTENANCE AND CURE, WAGES, OR WORKER' S COMPENSATION) OCCURRING IN CONNECTION WITH THE PERFORMANCE OR NON– PERFORMANCE OF THIS AGREEMENT, EXCEPTING, HOWEVER, FROM THIS INDEMNIFICATION ONLY THE VESSEL ITSELF (AS DEFINED HEREIN), AND ANY COMPONENTS, EQUIPMENT, AND MACHINERY ASSOCIATED WITH OR INCORPORATED INTO SUCH VESSEL, TO THE EXTENT ALLEGED OR ASSERTED BY OWNER, OR BY ANY OF OWNER'S SUBCONTRACTORS, OR BY ANY EMPLOYEE, AGENT OR INVITEE OF OWNER OR BY ANY EMPLOYEE, AGENT OR INVITEE OF OWNER'S SUBCONTRACTORS, OR BY ANY THIRD PARTY. THE RELEASE, DEFENSE, AND INDEMNIFICATION OBLIGATIONS OF OWNER PROVIDED IN THE PRECEDING SENTENCE SHALL APPLY, IN EACH CASE, TO THE EXTENT THAT SUCH CLAIM, DEMAND, LOSS, SUIT OR CAUSE OF ACTION IS ALLEGED TO BE CAUSED BY THE NEGLIGENCE, ACT, OMISSION, FAULT OR STRICT



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**LIABILITY OF ANY MEMBER OF THE OWNER GROUP, DEFECT IN PREMISES, OR ANY OTHER ACT OR OMISSION BY ANY MEMBER OF THE OWNER GROUP, AND REGARDLESS OF WHETHER SUCH NEGLIGENCE, ACT, OR OMISSION IS ACTIVE OR PASSIVE, PRIMARY OR SECONDARY.**

23.3 The foregoing indemnity obligations shall also include reasonable attorneys' fees, investigation costs and other costs and expenses incurred by the other party and/or its Indemnitees with respect to the matters described in this Agreement.

23.4 The indemnification provisions set forth in this Article shall survive the termination of this Agreement.

**ARTICLE 24 – NOT USED**

**ARTICLE 25 – DISPUTE RESOLUTION**

25.1 Whenever disputes, disagreements, or misunderstandings arise, Builder and Owner will attempt to resolve the issue(s) involved by good faith discussion and mutual agreement as soon as practicable.

25.2 Failing resolution by mutual agreement, the aggrieved party shall document the dispute, disagreement, or misunderstanding by notifying the other party in writing detailing the relevant facts, identifying unresolved issues, specifying the clarification or remedy sought, and detailing the rationale as to why the clarification/remedy is appropriate. The other party shall submit a written position on the matter(s) in dispute within ten (10) days after being notified. The parties will then meet within five (5) days thereafter to further address the dispute. If this process does not resolve the dispute, the aggrieved party may then pursue resolution under the remaining provisions of this Article 25.

25.3 All disputes arising out of or relating to this Agreement (except disputes for which Owner is entitled to injunctive relief under Article 6.3 and disputes which are to be resolved in accordance with Article 5.5) shall be submitted to and resolved exclusively through arbitration. On written demand of either party to invoke arbitration, each shall select an arbitrator and notify the other of the arbitrator so selected within three (3) days of such demand. The arbitrators shall then select a third arbitrator within three (3) days. If any party or the two arbitrators fail to timely appoint an arbitrator, the arbitrator shall be selected by the American Arbitration Association ("AAA"). The arbitrators shall decide on each issue or dispute presented to them by a majority vote. In all circumstances, the arbitration shall be conducted in New Orleans, Louisiana, but unless otherwise mutually agreed to, shall not be administered by the AAA. Alternatively, the parties may agree to appoint a single arbitrator with appropriate skill, knowledge and experience relevant to the dispute in order to obtain an expedient ruling. Such arbitrator shall endeavor to resolve a matter brought to him within thirty (30) days.

25.2 To invoke arbitration under this Article, either party shall notify the other, and the arbitrator, in writing, setting forth:

1.1.1. The issue to be arbitrated; and

1.1.2. That arbitration is demanded.

25.3 The arbitrators shall not be bound by the rules of evidence or civil procedure, but rather may consider such writings and oral presentations as reasonable shipbuilders and businessmen would use in the conduct of their day-to-day affairs, and may require the parties to submit some or all of their presentation orally or in written form as the arbitrators may deem appropriate. The arbitrators shall issue a reasoned award that explains the material facts, quantification of any monetary award and conclusions of law upon which the ruling and award is based.

25.4 The parties may follow such rules and procedures as are agreed to between the parties. If the parties cannot agree to such rules and procedures within two (2) days of an election to submit the dispute to arbitration, then the Commercial Arbitration Rules of the American Arbitration Association shall apply.

25.5 The decision of the arbitrator panel regarding any Dispute shall be binding upon the parties and



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

non-appealable but shall be enforceable in any court having jurisdiction.

## ARTICLE 26 – TAXES, DUTIES, AND CONTRACT EXPENSES

26.1 Builder shall pay all local, state, and federal taxes, federal import duties, workers' compensation, social security or old age benefits of any nature, unemployment tax, and any other similar taxes, charges, assessments and contributions of any kind now or hereafter payable in connection with the construction of the Vessel imposed upon, or with respect to, or measured by, Materials and labor utilized in the construction of the Vessel hereunder, or the wages, salaries or other remunerations paid to persons employed by Builder in connection with the performance of the Agreement, and Builder shall indemnify and hold Owner harmless from any and all liability and expense by reason of Builder's failure to pay such taxes, charges, assessments and contributions.

26.2 Owner agrees to pay such state or local sales or use or other taxes, if any, as may be mandatorily imposed by law in connection with the sale and Delivery of the Vessel. It is the intention of Owner, however, to avoid or minimize, to the greatest extent lawfully possible, the imposition of any state sales or use or other taxes with respect to the Vessel. This may involve claiming any lawfully available exemption(s), such as the "removal" exemption, the "Interstate or foreign commerce" exemption, the "resale" exemption, or taking delivery of the Vessel in a location outside the boundaries of the State of Louisiana. Builder shall use reasonable efforts to cooperate with Owner to achieve exemption from such sales or use or other taxes, but only to the extent permitted by applicable laws and regulations, and shall provide Owner with all such documentation as may be needed from Builder to assist Owner in establishing exemption from such sales or use or other taxes.

## ARTICLE 27 – LIENS AND ENCUMBRANCES

27.1 Following payment of the sums due to Builder by Owner hereunder, Builder agrees to deliver the Vessel to Owner free and clear of any and all liens, claims, encumbrances and rights in rem in favor of Builder or any workmen, materialmen, Subcontractors, or others to whom Builder is responsible, excluding liens, mortgages or encumbrances created by Owner.

27.2 In the event of the filing or attaching of any lien or encumbrances created or suffered by or through Builder or any of its Subcontractors or Suppliers against the Vessel before final payment, Owner may, but shall not be required to, satisfy the same out of any amount remaining to be paid to Builder hereunder, except where Builder notifies Owner of a bona fide dispute between Builder and such lienor. When the Final Acceptance Payment is to be made under this Agreement, as condition precedent thereto, Owner may, in its discretion, require that Builder provide to Owner a statement certifying and indemnifying Owner against any liens or rights in rem of any kind against the Vessel or its respective machinery, fittings, or equipment which relate to actions of Builder and excluding any liens or encumbrances created by Owner.

27.3 In addition to and notwithstanding the foregoing, Builder agrees to indemnify Owner and hold it harmless from and against all liens and claims for labor, material, taxes, privileges and licenses arising out of, in connection with, or resulting from the operations or activities of Builder, its employees or agents or Subcontractors and the employees or agents of their Subcontractors in connection with the construction and delivery of the Vessel, and agrees to defend any such claim asserted or suit brought against Owner and/or the Vessel and to pay any judgment rendered in any such action, provided, however, that Owner shall have the right, if it so elects, to participate at its own expense in the defense of any such claims or suits, but such participation shall not operate to affect Builder's liability and obligation hereunder.

27.4 Owner agrees to indemnify Builder and hold it harmless from and against all liens and claims for labor, materials, taxes, privileges and licenses arising out of, in connection with, or resulting from the operations or activities of Owner, its employees or agents or subcontractors and the employees or agents of their subcontractors, and agrees to defend any such claim asserted or suit brought against Builder and to pay any judgment rendered in any such action, provided, however, that Builder shall have the rights, if it so elects, to participate at its own expense in the defense of any such claims or suits, but such participation shall not operate to affect Owner's liability and obligation hereunder.



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

## ARTICLE 28 –NOT USED

## ARTICLE 29 – GENERAL

29.1 This Agreement may be executed in several counterparts, all of which may be taken to be one and the same agreement.

29.2 Builder acknowledges and agrees that certain information relating to Owner that may be disclosed to or otherwise acquired by Builder in connection with this Agreement and the negotiations leading up to its execution by one or both Parties, may constitute material, confidential and non-public information, which shall be governed by the Confidentiality and Non-Disclosure Agreement existing between the parties. Builder will not make any announcement or disclosure of the fact that such discussions have occurred, or of the terms of this Agreement without Owner's written consent, which shall not unreasonably withheld, except to the extent required by law. It is acknowledged and understood by the parties that each party shall be permitted to make press releases or other disclosure as required by law in the reasonable opinion of each party's counsel.

29.3 THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THIS SUBJECT MATTER, AND SUPERSEDES ALL PRIOR AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS AND UNDERSTANDINGS, EXCEPT THOSE EXPRESSLY SET FORTH HEREIN. NO OTHER AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS OR UNDERSTANDINGS, EITHER EXPRESS OR IMPLIED, UNLESS EXPRESSLY SET FORTH HEREIN, ARE BINDING BETWEEN THE PARTIES. THERE ARE NO INTENDED BENEFICIARIES TO THIS AGREEMENT ASIDE FROM THE PARTIES SIGNATORY HERETO.

29.4 In no event shall this Agreement be subject to or interpreted in accordance with the United Nations Convention on Contracts for the International Sale of Goods.

*Signature page following*



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

*Signature Page to Vessel Construction Agreement*

Executed on this 5th day of November 2021

**OWNER** CALLAN MARINE LTD
A Texas limited partnership

______________________ p.p. [signature]

By: Maxie J. McGuire Jr.
Its: President

Arie von der Adel
Chief Operating Officer
November 5th, 2021

**BUILDER** C&C MARINE AND REPAIR LLC
A Lousiana limited liability corporation

[signature]

By: Anthony Cibilic
Its: President



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Vessel Contract Price and Delivery Date |
| Exhibit B | Specifications |
| Exhibit C | Contract Drawings |
| Exhibit D | Makers List |
| Exhibit E | Owner Furnished Items |
| Exhibit F-1 | NOT USED |
| Exhibit F-2 | Form of Builder's Invoice |
| Exhibit G | Form of Lien Release and Waiver |
| Exhibit H | Form of Certificate of Completion and Delivery |
| Exhibit I | Form of Change Order |
| Exhibit J | Form of Owner's Warranty Notification to Builder |
| Exhibit K | Builder's Schedule |
| Exhibit L-1 | NOT USED |
| Exhibit L-2 | NOT USED |
| Exhibit M | Form of Protocol of Delivery and Acceptance |
| Exhibit N | NOT USED |
| Exhibit O | Time and Material Rates |
| Exhibit P | Form of Builder Contract Deficiency Report |
| Exhibit Q | Monthly Payment Schedule |



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

EXHIBIT A

NOT USED



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**EXHIBIT B**

**VESSEL SPECIFICATIONS**

[TO BE INCLUDED IN VESSEL SPECIFICATIONS:]

The Vessel shall be load lined (International) and shall be issued a COI in accordance with 46 CFR Subchapter "I" and applicable 33 CFR regulations.

[TO BE PROVIDED WITHIN 120 DAYS OF EXECUTION]



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**EXHIBIT C**

**CONTRACT DRAWINGS**

The contract drawings for the Vessel shall be similar to the drawings for the CSD GENERAL MACARTHUR with the exception of the areas, piping and/or pieces of equipment that are required to be modified to allow for the incorporation of the four (4) GE engines.

The contract drawings for the Vessel meet International Load Line requirements and meet 33 and 46 Code of Federal Regulations for certification under Sub-Chapter I.



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**EXHIBIT D**

**MAKERS LIST**

***

[TO BE PROVIDED WITHIN 120 DAYS OF EXECUTION]

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**EXHIBIT E**

**OWNER FURNISHED ITEMS**

- All Fluids
- Labor for the installation of Winch Cables
- Filters (replacement and/or spares)



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

EXHIBIT F-2

SAMPLE BUILDER'S INVOICE



E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

# INVOICE

Invoice Number: F-XXX
Invoice Date: Nov 1, 2021
Page: 1

**C & C Marine and Repair, L.L.C.**
Post Office Box 2253
Harvey, LA 70059-2253

Office: (504) 433-2000
Fax: (504) 433-2044

**Bill To:**
Caltan Marine Ltd.
Post Office Box 17017
Galveston, TX 77552

| Customer ID | Customer PO | Payment Terms | Due Date |
|---|---|---|---|
| CALM | | Net 30 Days | 12/1/21 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| | | Furnish labor, materials and equipment to provide the following services to "Vessel's Name" in accordance with our quote/contract | | |

Check/Credit Memo No:

| | |
|---|---|
| Subtotal | 0.00 |
| Sales Tax | |
| Total Invoice Amount | 0.00 |
| Payment/Credit Applied | |
| TOTAL | 0.00 |

E-Filed

FILED
2026 AUG 24 P 05:38
CIVIL
DISTRICT COURT

**EXHIBIT G**

**FORM OF LIEN RELEASE AND WAIVER**

[*see attached*]



E-Filed